Case No. 2026-2423

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

PHILLYWINE LLC,

*Appellant*,

v.

KSWCO LLC, SALKEDS LLC, THE NATIONAL WINE SCHOOL LLC, ALANA ZERBE, and KEITH WALLACE,

*Appellees*.

*On Appeal from the United States District Court for the Eastern District of Pennsylvania in Case No. 2:26-cv-01268 Judge Joshua D. Wolson*

# BRIEF OF APPELLANT AND APPENDIX VOLUME I

Brian T. Feeney, Esq.
GREENBERG TRAURIG, LLP
1717 Arch Street, Suite 400
Philadelphia, Pennsylvania 19103

Ian C. Ballon, Esq.
GREENBERG TRAURIG, LLP
1900 University Avenue, 5th Floor
East Palo Alto, California 94303

Marc H. Trachtenberg, Esq.
Barry R. Horwitz, Esq.
GREENBERG TRAURIG, LLP
360 N. Green Street, Suite 1300
Chicago, Illinois 60607

*Attorneys for Appellant PhillyWine LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Appellate Rule 26.1.0 and Federal Rule of Appellate Procedure 26.1, counsel for Appellant PhillyWine LLC certifies the following:

1. The full name of every party represented by the undersigned counsel is: PhillyWine LLC.

2. No other real parties in interest are represented by the undersigned.

3. There is no publicly-held company owning 10% or more of PhillyWine LLC's stock.

4. The names of all law firms and the partners or associates that appeared for the party now represented by the undersigned in the trial court or agency, or are expected to appear in this Court, are: Greenberg Traurig LLP: Ian C. Ballon, Brian T. Feeney, Marc H. Trachtenberg and Barry R. Horwitz.

Dated: September 28, 2026 *<u>/s/ Brian T. Feeney</u>*

# TABLE OF CONTENTS


STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ........... 1

STATEMENT OF THE ISSUES ........................................................................ 1

STATEMENT OF RELATED CASES AND PROCEEDINGS ..................................... 3

STATEMENT OF THE CASE ........................................................................ 3

A. The Parties ........................................................................ 3

1. PhillyWine LLC ........................................................................ 3

2. Defendants/Appellees ........................................................................ 4

B. Relevant Background Facts ........................................................................ 4

1. PhillyWine Has Used 'PhillyWine' As A Trademark For a Quarter Century ........................................................................ 4

2. WSOP Followed PhillyWine into the Market, Knew of PhillyWine's Use of 'PhillyWine,' and Operated Openly As 'The Wine School of Philadelphia' for a Quarter Century ...................... 5

3. WSOP Obtained a Federal Registration for PHILLY WINE SCHOOL Based on Knowingly False Statements ......................... 6

4. Armed with a Registration, WSOP Tried to Dismantle Appellant's Online Presence and Suddenly Expanded Its Use Exponentially, Causing Actual Confusion ..................................... 7

C. Procedural History ........................................................................ 10

D. Ruling Presented for Review ........................................................................ 11

SUMMARY OF ARGUMENT ........................................................................ 11

ARGUMENT ........................................................................ 14

I. Standard of Review ........................................................................ 14

**TABLE OF CONTENTS**

II. The District Court Misapplied Trademark Infringement Law to Determine Likelihood of Success on the Merits ........ 15

A. Because The District Court Misperceived the Issues, it Neglected to Determine Whether PhillyWine Owns Valid Protectable Rights in Its PhillyWine Marks ........ 18

B. The District Court Erred in Concluding That WSOP Used ‘Philly Wine School’ “As Early As 2005” Based on a Single Third-Party Article and Unsubstantiated Claims of Oral/Verbal Use ........ 21

1. Two Uses of a Phrase in Third-Party Media Articles Twelve Years Apart Cannot Establish Trademark Rights As a Matter of Law ........ 25

2. The District Court Erred in Granting WSOP a Priority Date Before Its First Written Use in the Record in Nov. 2024, As Any Earlier Use was Verbal or Oral Use ........ 26

C. The Opinion Erroneously Applied the *Lapp* Likelihood of Confusion Factors to the Facts Here, and its Weighing of those Factors was Legally Flawed Because of Its Misapplication of the Law ........ 28

1. The District Court Erred by Concluding That ‘PhillyWine’ For a Wine School is Not Confusingly Similar to ‘Philly Wine School’ ........ 29

2. The District Court Erred in Concluding The Consumer Level of Care and Relatedness of Services Were Neutral, But the Services are Identical and the Lower-Cost Classes for Consumers “with Less Deliberation” Control the Level of Care Analysis ........ 32

3. The District Court Misapplied the *Lapp* Factor on Actual Confusion, Erroneously Concluding That Only Point-of-Sale Confusion is Actionable Where No Confused Party Enrolled “in the Wrong Program” or “Paid The Wrong Provider” ........ 34

4. The District Court Misapplied the *Lapp* Factors on Actual Confusion, Erroneously Relying on WSOP’s So-Called “Concurrent Use” Falsely Dating Back to 2005 ........ 36

# TABLE OF CONTENTS


5. The District Court Erred in Its Analysis of the Intent Factor.........36

6. Where the Marketing Channels, Advertising Media and Target Customers All Directly Overlap, the District Court Erred in Not Decisively Finding These Factors Weigh Strongly for Plaintiff....38

7. The District Court Erred by Concluding That 'PhillyWine' is Not a Strong Mark in View of Its Longtime Exclusive Use and Extensive Evidence of Marketplace Recognition..........................39

III. In the Balance of Equities Analysis, the District Court Erred by Granting a Presumption of Validity to WSOP's Fraudulent Trademark Registration ..........................................................................................41

A. The District Court Tipped the Equities to WSOP Based on the Presumption of Validity Attached to Its Registration...............................42

B. A Registration Procured by Fraud Is Not Entitled to Dispositive Weight in the Balance of Equities..........................................................42

C. The Record Established That WSOP Procured the Registration Based on Evidence of Appellant's Use Through Knowingly False Statements, and the District Court Refused to Consider That Evidence..................................................................................................44

D. Properly Weighed, the Equities Do Not Favor WSOP............................45

IV. The District Court Correctly Concluded PhillyWine Showed Irreparable Harm, Underscoring the Urgent Need for Relief, But Failed to Extend the Legally Required Presumption of Harm Based on Outdated Case Law..........................................................................................46

V. An Injunction Is In the Public Interest..............................................................47

CONCLUSION ..........................................................................................................48

# TABLE OF CITATIONS

**Federal Cases** **Page(s)**

*800–JR Cigar, Inc. v. GoTo.com, Inc.*,
437 F. Supp. 2d 273 (D.N.J. 2006) .......... 36

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
237 F.3d 198 (3d Cir. 2000) .......... 17, 34, 39, 42

*Am. Fid. & Liberty Ins. Co. v. Am. Fig. Grp.*,
2000 U.S. Dist. LEXIS 13863 .......... 32

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
42 F.3d 1421 (3d Cir. 1994) .......... 49

*Apple Computer, Inc. v. Franklin Computer Corp.*,
714 F.2d 1240 (3d Cir. 1983) .......... 15

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*,
793 F.3d 313 (3d Cir. 2015) .......... 36, 48

*In re Bose Corp.*,
580 F.3d 1240 (Fed. Cir. 2009) .......... 44

*Brookfield Communs. v. West Coast Enter.*,
174 F.3d 1036 (9th Cir. 1999) .......... 17

*Checkpoint Sys. v. Check Point Software Techs., Inc.*,
269 F.3d 270 (3d Cir. 2001) .......... 30, 31, 38, 39

*Chutter, Inc. v. Great Mgmt. Grp.*, LLC
2021 WL 4494251 (TTAB 2021) (*rev'd on other grounds*, 90 F.4th 1333 (Fed. Cir. 2024)) .......... 44

*Commerce Nat. Ins. v. Commerce Ins. Agency*,
214 F.3d 432 (3d Cir. 2000) .......... 18

*Constructors Ass'n of W. Pa. v. Kreps*,
573 F.2d 811 (3d Cir. 1978) .......... 16

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) .......... 15

**TABLE OF CITATIONS**

**Federal Cases (con.)**

*Country Floors, Inc. v. P'ship of Gepner & Ford*,
930 F.2d 1056 (3d Cir. 1991) .......... 35, 37

*Covertech Fabric., Inc. v. TVM Bldg. Prods., Inc.*,
855 F.3d 163 (3d Cir. 2017) .......... 47

*Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*,
442 F.3d 812 (3d Cir. 2006) .......... 18

*Dranoff-Perlstein Associates v. Sklar*,
967 F.2d 852 (3d Cir. 1992) .......... 31

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
765 F.3d 205 (3d Cir. 2014) .......... 14, 15, 48

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*,
30 F.3d 466 (3d Cir. 1994) .......... 41, 42

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
930 F.2d 277 (3d Cir. 1991) .......... 20, 32, 33

*George & Co. LLC v. Imagination Entertainment Ltd.*,
575 F.3D 383 (4th Cir. 2009) .......... 27, 28

*In re HomeBanc Mortg. Corp.*,
945 F.3d 801 (3d Cir. 2019) .......... 15

*Interpace Corp. v. Lapp, Inc.*,
721 F.2d 460 (3d Cir. 1983) .......... 18, 34

*Jews for Jesus v. Brodsky*,
993 F. Supp. 282 (D.N.J. 1998) .......... 32

*Johnson v. Wetzel*,
209 F.Supp.3d 766 (2016) .......... 49

*Kos Pharms., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004) .......... 15, *passim*

*Lontex Corp. v. Nike, Inc.*,
107 F.4th 139 (3d Cir. 2024) .......... 30

**TABLE OF CITATIONS**

**Federal Cases (con.)**

*Lucent Info. Mgmt. v. Lucent Techs.*,
186 F.3d 311 (3d Cir. 1999) .......... 22, 25, 26

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*,
511 F.3d 350 (3d Cir. 2007) .......... 36

*Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*,
128 F.3d 1111 (7th Cir. 1997) .......... 32

*Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc.*,
937 F.2d 1572 (Fed. Cir. 1991) .......... 26

*Nichino Am., Inc. v. Valent U.S.A. LLC*,
44 F.4th 180 (3d Cir. 2022) .......... 48

*Opticians Assoc. of Am. v. Independent Opticians of Am.*,
920 F.2d 187 (3d Cir. 1990) .......... 15, 17, 45

*Pa. Prof'l Liab. Joint Underwriting Ass'n v. Wolf*,
328 F. Supp. 3d 400 (M.D. Pa. 2018) .......... 16

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
143 F.3d 800 (3d Cir. 1998) .......... 48

*Rearden LLC v. Rearden Commerce, Inc.*,
683 F.3d 1190 (9th Cir. 2012) .......... 22

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017) .......... 15

*Ruifei (Shenzhen) Smart Tech. Co., Ltd.*,
2024 WL 3423957 (TTAB July 2, 2024) .......... 44

S*&R Corp. v. Jiffy Lube Int'l, Inc.*,
968 F.2d 371 (3d Cir. 1992) .......... 49

*Sabinsa Corp. v. Creative Compounds, LLC*,
609 F.3d 175 (3d Cir. 2010) .......... 34, 41

*U.S. ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023) .......... 45

## TABLE OF CITATIONS

**Federal Cases (con.)**

*Trial Lawyers College v. Gerry Spence Trial Lawyers College at Thunderhead Ranch*, 23 F.4th 1262 (10th Cir. 2022) .......... 48

*UHS of Delaware, Inc. v. United Health Services, Inc.*, 227 F. Supp. 3d 381 (M.D. Pa. 2016) .......... 26, 28

*Universal Mins., Inc. v. C. A. Hughes & Co.*, 669 F.2d 98 (3d Cir. 1981) .......... 15

*Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293 (E.D. Pa. 2000) .......... 36

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205 (2000) .......... 18

*Warren Pub. Co. v. Spurlock*, 645 F. Supp. 2d 402 (E.D. Pa. 2009) .......... 25, 26, 28

**Federal Statutes**

15 U.S.C. § 1060(a)(1) .......... 18

15 U.S.C. § 1060(a)(3) .......... 18

15 U.S.C. § 1115(a) .......... 44

15 U.S.C. § 1116(a) .......... 48

15 U.S.C. § 1119 .......... 44

15 U.S.C. § 1064(3) .......... 44

15 U.S.C. § 1115(b)(1) .......... 44

**Rules**

3d Cir. L.A.R. 26.1.0 .......... 3

Fed. R. App. P. 26.1 .......... 3

## TABLE OF CITATIONS

### Other Authorities

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3:1 (5th ed. 2026) .......... 23

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:1 (5th ed. 2026) .......... 23

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:4 (4th ed. 2005) .......... 18

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:7 (4th ed. 2005) .......... 32

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:15(4th ed. 2005) .......... 31

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:50 (4th ed. 2005) .......... 32

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The District Court had jurisdiction over this case pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 and 1367.

This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) because this appeal is from the District Court's May 26, 2026 order denying Appellant's motion for preliminary injunction. A4-40.

Appellant timely filed a Notice of Appeal on June 5, 2026. A1-3.

## STATEMENT OF THE ISSUES

1. Did the District Court err in using the wrong test to determine likely success on the merits, by failing to decide whether Appellant owns valid, protectable rights in its trademarks 'PhillyWine' and 'PhillyWine.com,' both used in connection with a wine school, and instead requiring Plaintiff to show it owns protectable rights in Appellees' infringing, alleged mark 'Philly Wine School?'

2. Did the District Court err in concluding that Appellees' alleged rights in their alleged 'Philly Wine School' mark began "as early as 2005" and that Appellees continuously used that mark for the next two decades based solely on two third-party unauthenticated hearsay articles dated 2005 and 2017 and unsupported claims of verbal use, where the only evidence of Appellees' own written use is dated November 2024?

3. Did the District Court erroneously apply the likelihood of confusion *Lapp* factors, including by (i) erroneously weighing those factors and failing to accord them

proper weight and apply them in view of controlling law; (ii) erroneously concluding that 'PhillyWine' and 'Philly Wine School,' both used with wine school services, are not confusingly similar, and that the similarity of the marks factor "does not favor either party"; (iii) erroneously concluding that the level of care of two consumer classes (one sophisticated and the other not) "offset" each other, instead of following Third Circuit mandates that the non-sophisticated consumer class sets the level of care; (iv) erroneously concluding that the relatedness of the services factor is neutral and does not favor either side where the parties' services are identical and directly competitive; (v) erroneously applying the two factors on actual confusion, both by discounting evidence of confusion because no consumer enrolled "in the wrong program" or "paid the wrong provider" (where Third Circuit law does ***not*** hold that *only* point-of-sale confusion is actionable), and by failing to accord weight to actual confusion evidence based on false "periods of coexistence" premised on Appellees' unsubstantiated use of its mark for over two decades; (vi) erroneously concluding that the intent factor does not favor Appellant when there is clear, unrefuted evidence of intent to copy and divert consumers; (vi) erroneously concluding that the factors of marketing channels, target customers and advertising media do not strongly favor Appellant when they all directly overlap; and (vii) erroneously concluding that 'PhillyWine' lacks commercial strength where the District Court focused only on Appellant's rights relative to the alleged mark 'Philly Wine School'?

4. Did the District Court err in presuming the validity of Appellees' fraudulently obtained federal trademark registration, where both sides spent "substantial time debating whether [that] registration of 'Philly Wine School' is valid," but the District Court concluded "that dispute doesn't seem to matter," even though the District Court's balance of equities analysis hinges on Appellees' "reliance on a federal trademark registration that remains valid and has not been invalidated?" A21 n.4, A39.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

No related lawsuit or civil action is pending in the District Court or any other court. Appellant filed a cancellation action with the Trademark Trial and Appeal Board of the USPTO, Case No. 92092084, which is currently suspended pending the disposition of this lawsuit.

## STATEMENT OF THE CASE

### A. The Parties

#### 1. PhillyWine LLC

Plaintiff/Appellant PhillyWine LLC, a Pennsylvania limited liability company, operates a wine school based in Philadelphia. It is the successor to an unincorporated business owned by Neal Ewing known as Neal Ewing Wine Services. A992–93, A104–05, ¶¶ 3, 9; A995-96, ¶¶ 6-11. PhillyWine LLC and Ewing ("Philly Wine") continuously used 'PhillyWine' and 'phillywine.com' (the "PhillyWine Marks") since 2001 in connection with its wine school. A992, A104, ¶ 7; A998, ¶ 18; A2547, ¶¶ 6–7; A2556–3455.

#### 2. Defendants/Appellees

Defendants/Appellees are husband and wife Keith Wallace (Wallace) and Alana Zerbe and their companies, which together own and operate the Wine School of Philadelphia (collectively, "WSOP") and its website www.vinology.com. A1909, A1911, ¶¶ 7–8, 26.

### B. Relevant Background Facts

#### 1. PhillyWine Has Used 'PhillyWine' As A Trademark For a Quarter Century

PhillyWine has offered wine education courses under the PhillyWine brand for decades, since before WSOP existed. A992–93, A104–05; A1768, ¶ 4; A1909, ¶¶ 7–8. Ewing founded the business, which in 1999 became approved to teach the curriculum of the Wine & Spirit Education Trust (WSET), the London-based global standard in wine education. A992, A104, ¶ 7. WSET does not offer educational services, but licenses providers like PhillyWine that survive its rigorous approval process to deliver its curriculum and administer examinations. A992, A104, ¶ 4; A111. PhillyWine has been WSET-licensed without interruption since 1999, it is one of only four WSET-certified providers on the East Coast authorized to certify all four levels of WSET wine education (from Level 1 Beginner to Level 4 Diploma), and it is the longest-tenured continuous provider in the region. A997, ¶ 14.

Ewing registered phillywine.com on August 28, 2001, and that domain has hosted PhillyWine's primary website ever since. A992, A104, ¶ 7; A118–19; A2556–3455. Since

that time over 25 years ago, PhillyWine has promoted itself under the PhillyWine Marks through regular newsletters and branded materials. A998, ¶ 18; A1042–43; A2549, ¶ 19; A3486–95. When he retired in 2022, Ewing transferred and assigned the entire business to his former students Noelle Allen and Dr. Matt Kirkland,[1] "including, but not limited to, all rights and goodwill in the PhillyWine name and trademarks." A993, A105, ¶ 9; A996, ¶ 11. The two formed PhillyWine LLC on May 26, 2022, and WSET approved the new entity to teach its courses. A996, ¶¶ 9–10; A1007–11.

Over decades, the PhillyWine brand and business grew to a substantial enterprise: more than 5,600 students have taken its courses, it has earned over $4 million in revenue under the PhillyWine Marks and spent hundreds of thousands of dollars in advertising, and it has partnered with several local colleges and universities. A997–98, ¶¶ 16–17, 19.

#### 2. WSOP Followed PhillyWine into the Market, Knew of PhillyWine's Use of 'PhillyWine,' and Operated Openly As 'The Wine School of Philadelphia' for a Quarter Century

In 2001, Appellee Wallace founded the Wine School of Philadelphia, which he operates through the website vinology.com. A1909, ¶¶ 7–8; A998, ¶ 20. For many years, WSOP worked to maintain a clear distance between the two businesses. After WSET objected in 2019 to Wallace's public assertions comparing his program to WSET on his

[1] The District Court incorrectly characterized Allen and Kirkland as married, and Allen as Ewing's daughter—writing that Ewing retired and transferred the business to his "daughter and son-in-law, Noelle Allen and Dr. Matt Kirkland respectively." A7. In fact, Allen and Kirkland are not married to each other, nor is she Ewing's daughter. The record contains no support for those statements.

website, Wallace posted a disclaimer in bold text on vinology.com stating, "We are Vinology.com not Phillywine.com," which he left up for five years, until he removed it after PhillyWine sent the cease-and-desist letter that precipitated this lawsuit. A998, ¶¶ 21–22; A1075–79; A239–43; A1081; A420.

WSOP knew of PhillyWine and its brand the whole time. Allen—who took more than a dozen WSOP courses between 2013 and 2016 and worked there as an events coordinator—attests that on November 1, 2018, Wallace told her he "took the Instagram handle @PhillyWine to mess with or upset Neal," so that when "people are looking for him," "they're gonna find me." A1287, ¶ 11; A1286, ¶ 5. Wallace also told her he would call and email Ewing pretending to be prospective PhillyWine students "just to mess with Neal." A1286, ¶ 7. And, an article on SOMM.us—a purportedly independent review site that Wallace himself controls—described a "rivalry between" Ewing and WSOP. A999, ¶ 25; A1104–09; A410. While Wallace claims he used 'Philly Wine School' since 2005, the record refutes this, showing he disclaimed any connection to PhillyWine, and his only evidence is from alleged, legally irrelevant third-party articles, as discussed below.

#### 3. WSOP Obtained a Federal Registration for PHILLY WINE SCHOOL Based on Knowingly False Statements

In November 2024, KSWCO applied to register PHILLY WINE SCHOOL for wine education services, falsely claiming first use in 2016 and submitting as its specimen a vinology.com page dated the day of the filing. A1002, ¶ 34; A1153–58, A270–75. When the USPTO refused the mark as merely descriptive, KSWCO sought registration under

Section 2(f), claiming the mark had acquired distinctiveness "through nearly two decades of continuous use, . . . independent press recognition, and substantially exclusive use." A1003, ¶ 36; A1169; A313.

The record refutes those representations. WSOP first used "PHILLY WINE SCHOOL" on vinology.com on November 23, 2024 (the day of its filing). A1003, ¶ 38; A1256–82; A276–302; A1158; A275. The two documented references to "Philly Wine School" that predated November 2024 were ostensibly made by third parties in hearsay articles. And in his Section 2(f) submission, two third-party references WSOP offered as proof of distinctiveness actually pointed to PhillyWine: the biography of instructor Susan Lynham, who teaches for PhillyWine and never taught for WSOP, which states that she "currently teaches at the Philly Wine School"; and a Reddit post, describing a "WSET in-person course" that "would be at the Philly wine school"—though WSOP offers no WSET courses. A1003–04, ¶¶ 39–43; A1181; A325; A1184; A328; A1918, ¶¶ 75–76. The registration issued on December 9, 2025, with "WINE SCHOOL" disclaimed as generic. A1004, ¶ 44; A1151, A403, A2063; A1164, A308; A2058; A2047–2545.

#### 4. Armed with a Registration, WSOP Tried to Dismantle Appellant's Online Presence and Suddenly Expanded Its Use Exponentially, Causing Actual Confusion

Once the registration issued, WSOP targeted the online channels on which PhillyWine depends for its business. On December 18, 2025, after Wallace complained to Instagram that PhillyWine's account name @PhillyWineSchool infringed his

ostensible rights, Instagram suspended the account, PhillyWine's primary means of reaching students, cutting it off from the followers it had gathered over many years. A999, ¶ 27; A1005, ¶¶ 50–51; A1110–11. PhillyWine registered that account name because Wallace intentionally registered the name @PhillyWine to divert PhillyWine's customers. A1287, ¶ 11; A2549, ¶ 21. Days later, Wallace sought to transfer ownership of PhillyWine's Google Business Profile to him, which would have handed him control of PhillyWine's hours, location, reviews, and ad account. A999–1000, ¶¶ 28–29; A1112–17. In January 2026, after being told to cease and desist, Wallace complained to Squarespace that phillywine.com—a domain continuously in use since 2001—was "a deceptive spacing variant" of his mark and demanded its "immediate removal." A1000–01, ¶ 30; A1127–28; A417–18.

After PhillyWine retained counsel and exchanged many emails on the matter with WSOP's counsel, its conduct escalated: Among other actions, Wallace created Facebook events displaying "PHILLY WINE" with "SCHOOL" trimmed from view, placed a Google "PHILLY WINE SCHOOL" location at WSOP's address that appears on Google Maps beside Appellant, and entered his 'Philly Wine School' into a Best Vocational School contest run by the Philadelphia Inquirer, despite statements on WSOP's website that it only offers "non-vocational wine education." A1004–05, ¶¶ 45–48; A1013–20, A1283–84; A2551, ¶ 28; A3552–57. By February 2026, a Google search for "phillywine"

returned “PhillyWine School” at vinology.com as the top result, under the banner “Original Philly Wine.” A1005, ¶ 49; A1022.

This conduct led to actual confusion. For example, on December 2, 2025, a student emailed Allen about an event advertised as ‘Philly Wine School,’ writing he “thought it was your school” before realizing “this was for the other school, the Wine School of Philadelphia.” A1005, ¶ 52; A1027, A430. Confusion ran the other way too: a purported reviewer who never was Appellant’s student complained on its Google listing that it was “not located where they claim”: a complaint that could only have come from a consumer confusing the two schools. A1005–06, ¶ 53; A1029. And Kelly Daniels, who discovered the depths of her confusion only after the Inquirer wrote an article about this lawsuit, documented yet more confusion. A3602–04, ¶¶ 17–18; A3657, ¶ 14.

In sum, the record shows Appellant and its predecessor used the PhillyWine Marks for a wine school continuously and exclusively for 25 years, building substantial goodwill among consumers in Philadelphia and beyond. A992–93; A104–05; A996–98, ¶¶ 12–19; A1722–49; A1751–66; A1768–77; A1792-93; A2547–48, ¶¶ 4–8. Appellees’ own written use of ‘Philly Wine School’ began only in late 2024 and has only been enabled by a registration they obtained fraudulently based on representations that the evidence shows are false, and were knowingly false when they were made. A1002–04, ¶¶ 34–43; A1153–58; A270–75; A1168–1253; A312–97. On this record, PhillyWine filed for the preliminary injunctive relief at issue in this appeal.

### C. Procedural History

PhillyWine filed this case on February 26, 2026, asserting Lanham Act claims and related state-law claims and challenging the validity of WSOP's registration and its use of 'Philly Wine School' in commerce. A51-102; *see* A13. The next day, PhillyWine moved for a preliminary injunction asking the District Court to enjoin WSOP's sudden and ever-expanding use of 'Philly Wine School,' and to enjoin further disruptive and unwarranted enforcement efforts aimed at harming PhillyWine's online presence. A986-990. WSOP filed opposition papers on March 16, 2026. A1908.

On March 17, 2026, the District Court scheduled oral argument on the motion for April 21, 2026. A2046.

On March 25, 2026, PhillyWine filed its reply along with a Request for Judicial Notice of four categories of USPTO records: (1) the Office Action refusing to register Appellees' mark; (2) the certificate reflecting the registration's disclaimer of the words 'Wine School'; (3) a set of registration certificates where 'School' was disclaimed; and (4) the corresponding Office Actions. A2047–51, A2053–2545. The District Court never ruled on that Request and did not mention it or the relevant USPTO records in its Memorandum and Order. *See* A4–40. Appellees filed a sur-reply on April 1, 2026. A3805.

In the end, there was no oral argument: the District Court decided the motion on the papers "without an evidentiary hearing or oral argument." A13 & n.2. On May 26,

2026, the District Court issued a Memorandum and an Order denying the motion. A4–40. Appellant filed a timely Notice of Appeal on June 5, 2026. A1-3.

### D. Ruling Presented for Review

The ruling presented for review is the District Court's May 26, 2026 Order denying Plaintiff's Motion for Preliminary Injunction, A4, and the accompanying Memorandum (the "Opinion"), A5–40. The District Court concluded PhillyWine failed to prove likely success on the merits, but its entire analysis was based on the erroneous proposition that PhillyWine's success depends on it establishing rights in the infringing mark 'Philly Wine School' instead of its longstanding PhillyWine brand, its inexplicable conclusion that PhillyWine and 'Philly Wine School,' both for wine schools, are not confusingly similar, and its contradictory beliefs that WSOP's trademark registration, which was procured through fraud and is thus invalid, is an issue that "doesn't seem to matter," even though it also foundationally hinged its balance of equity analysis on that registration being presumed valid and not having been invalidated.

## SUMMARY OF ARGUMENT

The District Court correctly concluded that PhillyWine suffered irreparable harm from WSOP's conduct in using its fraudulent registration to systematically dismantle PhillyWine's online presence. That harm "does not rest solely on consumer confusion," but arose from the "disruption of its ability to control how it presents itself" to and communicate with customers including the suspension of its Instagram account, "through

which it advertised courses, communicated with students and maintained ongoing relationships with its customer base"—where the loss "includes not only past content but also access to followers and prospective students accumulated over time." A37–38 (also noting these "are not losses that can be readily quantified or restored through damages after trial"). That finding underscores PhillyWine's urgent need for relief.

Although it found that WSOP's actions inflicted irreparable harm on PhillyWine, the District Court denied preliminary injunctive relief, concluding that PhillyWine was not likely to succeed on the merits. In so ruling, District Court misapplied well-settled trademark infringement law in multiple respects. Most fundamentally, the District Court erred by formulating the question it thought it had to analyze as whether PhillyWine proved it owned valid trademark rights in WSOP's 'Philly Wine School' mark. A5, A16. But a trademark infringement plaintiff is not required to prove that it owns rights in another's mark; rather, it must prove it owns the marks it asserts. The key questions in a trademark infringement claim are whether the plaintiff has proved that (1) it holds valid trademark rights in any mark it asserts; and (2) any valid asserted marks are likely to result in confusion with the mark the defendants use. The District Court erred by viewing every issue through that incorrect legal prism, thereby contaminating its entire legal analysis.

With the proper test applied, there can be no serious dispute that PhillyWine was entitled to an injunction enjoining the irreparable harm the District Court concluded was

ongoing. First, the record below established that PhillyWine is substantially likely to successfully show it owns valid and exclusive trademark rights in its PhillyWine Marks:

- The record reflects PhillyWine's continuous use of those marks on its website dating back to 2001, whereas all of WSOP's claims of use pre-2024 implicitly rely on a doctrinal *exception* to the general rule: that a party claiming trademark rights must actually use the trademark itself, as part of a deliberate ongoing program to commercially exploit the mark.

- The "exception" Appellees claim that their use is grounded in is their attestation that their consumers began colloquially referring to their school as 'Philly Wine School.' But this is not evidenced in writing anywhere in the record, so it implicitly relies on an alleged vesting of trademark rights based solely on verbal or oral use of the mark, which courts have roundly rejected.

Second, the record below established that PhillyWine would likely succeed in showing WSOP's use of 'Philly Wine School' to promote its wine school is confusingly similar to "PhillyWine" and "phillywine.com." The record reflects multiple instances of actual confusion caused by WSOP's conduct, and as a matter of black letter trademark law 'Philly Wine School,' for a wine school, is identical to PhillyWine, also for a wine school.

The District Court also fundamentally erred by hinging its analysis of balancing the equities on a presumption of validity for WSOP's fraudulently obtained federal trademark registration, even though the parties vigorously disputed the validity of that registration. Remarkably, the District Court expressly found "that dispute doesn't seem to matter," A21 n.4, before, eighteen pages later, deciding that the presumption of validity controls the outcome. A39. Again, the Opinion correctly concluded that WSOP's conduct enforcing its (fraudulently-obtained) federal registration caused PhillyWine irreparable

harm by seeking to remove it from the internet. A37–39. Deciding a preliminary injunction requires balancing the equities. But in doing so, a court cannot, as the District Court did here, expressly opt to ignore and not bother to analyze evidence offered to show the registration *found to be causing harm* was also *procured by fraud* and is thus invalid. That evidence included WSOP's own submission to the USPTO in its claim of acquired distinctiveness, where WSOP relied on evidence that it *knew* referred to PhillyWine (as 'Philly Wine School') as if it were evidence of WSOP's own alleged use.

The Court should reverse and remand with instructions to issue a preliminary injunction on an expedited basis.

## ARGUMENT

### I. Standard of Review

A district court's denial of a preliminary injunction is reviewed for abuse of discretion. *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). A district court's findings of fact are reviewed for clear error, while its conclusions of law are subject to plenary review. *Ferring*, 765 F.3d at 210; *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). A district court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). Thus, while purely "factual findings are reviewed for clear-error," the district court's "'choice and interpretation of

legal precepts and its application of those precepts to the historical facts' receive plenary review." *In re HomeBanc Mortg. Corp.*, 945 F.3d 801 (3d Cir. 2019) (quoting *Universal Mins., Inc. v. C. A. Hughes & Co.*, 669 F.2d 98, 103 (3d Cir. 1981)).

Accordingly, "reversal is warranted if the trial court has abused its discretion or committed error in applying the law." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1242 (3d Cir. 1983). "Despite oft repeated statements that the issuance of a preliminary injunction rests in the discretion of the trial judge whose decisions will be reversed only for 'abuse,' a court of appeals must reverse if the district court has proceeded on the basis of an erroneous view of the applicable law." *Id.* "Reversal is warranted in the present case because the district court committed [multiple] obvious error[s] in applying the law of trademarks." *Opticians Assoc. of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990) (reversing and remanding with instructions to grant the motion for preliminary injunction).

## II. The District Court Misapplied Trademark Infringement Law to Determine Likelihood of Success on the Merits

"A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos*, 369 F.3d at 708. Further, the Third Circuit applies a bidirectional sliding scale for the first two factors. *See Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978) (preliminary injunction may

be appropriate where irreparable harm strongly favors the movant, even if plaintiff "did not demonstrate as strong a likelihood of ultimate success as would" typically be required) (cleaned up); *Pa. Prof'l Liab. Joint Underwriting Ass'n v. Wolf*, 328 F. Supp. 3d 400, 411 (M.D. Pa. 2018) (noting the "required showings on irreparable harm and likelihood of success are correlative: hence, the weaker a plaintiff's merits showing, the more is required of the showing of irreparable harm, and vice versa").

The District Court erred fundamentally by starting from the wrong premise and applying the wrong test, describing the case as about two local businesses that "have a fight about whether one of them has shown protectable rights in the phrase 'Philly Wine School.'" A5. Its likelihood of success analysis began by saying PhillyWine

> asserts rights in three marks—"PhillyWine," "phillywine.com," and "Philly Wine School." The alleged infringement, however, centers on the Wine School's use of "Philly Wine School," *which is the relevant mark for purposes of assessing the merits of PhillyWine's claims*.

A16 (emphasis added). By focusing on 'Philly Wine School' as "the relevant mark," the District Court ignored PhillyWine's superior rights in 'PhillyWine.' Rather than address those rights, and that Appellees' use of 'Philly Wine School' was confusingly similar therewith, the District Court recast PhillyWine as "invok[ing] a family of marks theory" and rejected PhillyWine's claims under that doctrine. A25–26.[2]

---

[2] PhillyWine notably never invoked this doctrine, and it does not apply here. PhillyWine has used both 'PhillyWine' and 'PhillyWine.com' for *decades*, and case law holds that these are for all intents and purposes the same mark. *Brookfield Communs. v. West Coast*

To prevail on a trademark infringement claim, "the owner of a valid and legally protectable mark [must prove] that a defendant's use of a similar mark for its [services] 'causes a likelihood of confusion.'" *Kos*, 369 F.3d at 708-09 (quoting *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000)). These are two distinct issues that are evaluated separately. First, the plaintiff must prove it owns a valid, protectable mark. *Opticians*, 920 F.2d at 192. Then it must prove the defendant's mark is likely to cause confusion. *Kos,* 369 F.3d at 709. The issue is not—as the District Court framed it—whether PhillyWine showed it owns protectable rights in 'Philly Wine School,' but whether PhillyWine showed it owns protectable rights in 'phillywine.com' or 'PhillyWine' and whether WSOP's use of 'Philly Wine School' is likely to cause confusion.

Where (as here) the asserted mark is neither registered nor inherently distinctive, a plaintiff must establish secondary meaning in its mark "at the time and place that the defendant began use of the [infringing] mark." *Commerce Nat. Ins. v. Commerce Ins. Agency*, 214 F.3d 432, 438 (3d Cir. 2000). Secondary meaning is when the primary meaning of a mark in the public's mind identifies "the source of the [service] rather than the [service] itself." *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 211 (2000). The latter issue, likelihood of confusion, is evaluated using the "*Lapp* factors." Kos, 369 F.3d at 709 (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)).

---

*Enter.*, 174 F.3d 1036, 1045, 1055 (9th Cir. 1999) (collecting cases finding that [mark] and [mark].com are "the same mark" or "virtually identical").

### A. Because The District Court Misperceived the Issues, it Neglected to Determine Whether PhillyWine Owns[3] Valid Protectable Rights in Its PhillyWine Marks

The District Court erred because its primary analysis is limited to whether PhillyWine has protectable rights in 'Philly Wine School' rather than in its house mark PhillyWine. It decided that 'Philly Wine School' is descriptive, and that PhillyWine must show secondary meaning in that descriptive term. A17–18. Thus, the District Court incorrectly evaluated the record from the prism of whether it shows that PhillyWine has secondary meaning in the term "Philly Wine School." A19–21.

To be clear, the District Court correctly observed that plenty of evidence showed that PhillyWine owns rights in its 'PhillyWine' mark. *See* A19–20 (noting PhillyWine offered evidence of its use of 'PhillyWine' as its "broader business identity," and its "proof of sales, growth, and market presence reflect[ing] the success of its business"). But because the Opinion skewed the key legal determination through the prism that 'Philly Wine School' is "the mark at issue," A20, it did not decide if PhillyWine

---

[3] The District Court assumed "that Neal Ewing transferred the asserted trademark rights to PhillyWine LLC," but stated: "If this case moves forward, PhillyWine will have to provide proof of that transaction." A22 n.6. But the Lanham Act does not require that common law marks be assigned in writing. *See* 15 U.S.C. § 1060(a)(1), (3); *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006) (noting an assignment of a common law mark "may be proven by the clear and uncontradicted oral testimony of a person in a position to have actual knowledge") (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:4 (4th ed. 2005)). Here, both the Kirkland and Ewing Declarations attested to the transfer of the entire business from Ewing to PhillyWine, and the assignment of the 'PhillyWine' mark therewith. A993, A105, ¶ 9; A996, ¶ 11; A2547 ¶¶ 4–5.

established protectable rights in its house mark. *See* A19 (stating PhillyWine's evidence "could demonstrate recognition of" the terms PhillyWine and phillywine.com, and then, without explanation or analysis, "though in my view it doesn't reach that level," before clarifying the District Court's view that such a determination is irrelevant because "in any event, it does not demonstrate that consumers associate the distinct phrase 'Philly Wine School' with PhillyWine" and finding "Evidence that consumers recognize one name does not, without more, establish that they associate a different phrase with the same provider"). The Opinion even rejects PhillyWine's numerous customer declarations because they "underscore the point" in that "*they consistently reference familiarity with 'PhillyWine,'* **not the mark at issue,**" A19–20 (all emphases added), when under black letter trademark infringement law, 'PhillyWine' is precisely the mark at issue.

The record below showed that PhillyWine has acquired distinctiveness and owns protectable rights in 'PhillyWine,' but the District Court did not decide that issue because it erred by misstating the legal issue, as if the only way WSOP could be enjoined is for PhillyWine to show it owns rights in the exact mark being used ('Philly Wine School'). That is an erroneous view of the law, because it collapses to only a single issue the two distinct inquiries applicable in any trademark case—whether the plaintiff can establish valid, protectable rights in an asserted trademark; and whether the term or mark used by defendant is confusingly similar to that asserted mark. *Kos,* 369 F.3d at 708-09.

The record below established that PhillyWine owns rights in 'PhillyWine.' Courts consider 11 non-exclusive factors to analyze secondary meaning: (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991). The record showed that PhillyWine (1) earned over $4 million in sales and spent multiple six figures on advertising (A998, ¶ 19); (2) it has used PhillyWine and PhillyWine.com for 25 consecutive years, with nearly all of those being exclusive (but for Appellees' token use beginning in 2024, as explained below) (factors 2-3); (3) Appellees intentionally copied Plaintiff's mark to divert customers (factor 4, A1286–87, ¶¶ 7, 11; (4) twenty-four people attested in declarations as to their recognition of the 'PhillyWine' mark and association of it with Appellant and its predecessor going back decades (factor 6, A1722–49, A1751–66, A1768–77, A1792–93); (5) Appellant has educated more than 5,600 wine students and/or customers under its PhillyWine mark since at least as early as 2001 (factors 9-10, A997, ¶¶ 15–16); and (6) evidence of actual confusion (factor 11, A1005–06, ¶¶ 52–53).

The District Court erroneously concluded, based on Appellees' opposition and Wallace's declaration, that "[f]or much of the relevant period, the business promoted itself as 'Neal Ewing Wine Services,'" and that this "was its outward-facing identity." A23.

But this is false. Rebuttal evidence before the District Court included Exhibit AG, the 25-year history of Appellant's website phillywine.com (as stored by the Internet Archive), where the term 'PhillyWine' and its variations appear more than 1,550 times (while 'Neal Ewing Wine Services' only appears 350 times). A2547, ¶ 7, A2556–3455. The District Court also chided PhillyWine because its "evidence of business growth," including its "decades of operation, increasing enrollment, and millions of dollars in revenue" are presented "at the enterprise level." A23. But that is exactly how it should be presented for an enterprise widely known as 'PhillyWine,' as the declarations attest. A1722–49; A1751–66; A1768–1815. The District Court committed further legal error by considering only "commercial activity [that] occurred under the 'Philly Wine School' name," so the Opinion ignores all of the record evidence regarding the use, recognition and business growth under the 'PhillyWine' brand, to reach the conclusion that PhillyWine cannot show priority over the name 'Philly Wine School.' A23–24. Applying the correct legal test, PhillyWine owns established rights in its 'PhillyWine' mark, which serve as the basis for a likelihood of confusion analysis comparing the similarities of 'PhillyWine' and 'Philly Wine School' (both used for identical wine school services).

### B. The District Court Erred in Concluding That WSOP Used 'Philly Wine School' "As Early As 2005" Based on a Single Third-Party Article and Unsubstantiated Claims of Oral/Verbal Use

The Opinion concluded that third-party media publications referred to Appellees' Wine School of Philadelphia as 'Philly Wine School' "as early as 2005" and that the same

phrase "continued to appear in articles, reviews and event descriptions over time." A8–9. While the phrase apparently appeared once in an article ostensibly dated 2005, and another from 2017, as discussed below, such sporadic evidence of use, only by third parties and not by the alleged mark holder, cannot give rise to trademark rights, and the Opinion's citations for the phrase "continued to appear . . . over time" do not support that proposition.

"It is a well-established principle of trademark law that the exclusive right to a distinctive mark belongs to ***the party which first uses the mark*** in connection with its" business. *Lucent Info. Mgmt. v. Lucent Techs.*, 186 F.3d 311, 319 (3d Cir. 1999) (emphasis added) (also noting a "first actual use in commerce . . . must be 'deliberate and continuous, not sporadic, casual or transitory"); *accord Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1203 (9th Cir. 2012) (calling it axiomatic "that the standard test of [trademark] ownership is priority of use": "the party claiming ownership must have been the first to actually use the mark"); 1 McCarthy on Trademarks and Unfair Competition § 3:1 (5th ed. 2026) (noting the three fundamental requirements of a word or symbol to qualify as a trademark include "actual use in trade of the symbol as a mark **by a seller** of goods or services") (emphasis added).[4] A party's ownership of a trademark thus flows from its own use of that mark, which is nearly always documented *in writing*.

[4] *Id.* § 16:1 (for an inherently distinctive mark, "ownership goes to the first entity to use the designation as a mark," but as "non-inherently distinctive marks require secondary meaning, ownership generally goes to the first entity to acquire secondary meaning").

Here, the sum total evidence in the record WSOP submitted to support its claim to own/use 'Philly Wine School' consists of: (i) Appellees' unsubstantiated claim that "consumers began colloquially referring to [WSOP] as 'the Philly Wine School'" (A1911 ¶ 21); (ii) an unauthenticated article ostensibly published in the October 5-11, 2005 edition of *Graffiti Magazine* that refers to WSOP as 'Philly Wine School' (A1926); (iii) Wallace's March 2026 declaration, in which he says that WSOP "began using 'Philly Wine School [starting] from about August 2016"[5] (A1916, ¶ 67), but no documentary evidence in the record shows this; and (iv) another unauthenticated third-party article ostensibly published in April 2017, where a local reporter who "attended a whiskey class" referred to 'Philly Wine School' (A2013). Apart from Wallace's claim and the two articles, WSOP has done nothing more to support its claim that its consumers began colloquially referring to it as 'Philly Wine School' at any time, much less that those consumers ***continuously*** did so over the course of ***twenty years***. Nor did WSOP submit ***any*** documentary evidence to support its claim of beginning to use 'Philly Wine School' in August 2016, or at any other time before the last few years. By contrast, the record shows that WSOP's earliest use of 'Philly Wine School' *in writing* was on its website, dated November 23, 2024. A1003, ¶ 38; A1256–82; A276–302; A1158; A275. And, while Appellees claim to have been using 'Philly Wine School' in 2005 and up through 2010, other documents from that period

---

[5] This admission notably contradicts WSOP's claim to the USPTO, that it had used 'Philly Wine School' for nearly two decades. A1003, ¶ 36; A1169, A313; A1916, ¶ 67.

showing WSOP's own written use of its name refer ***only*** to "The Wine School of Philadelphia." A1795; A1803; A1806–08; A232–37.

In short, the District Court accepted Appellees' bald assertions, despite the absence of any supporting evidence, that ***they*** continuously used 'Philly Wine School' since 2005, even though they also asserted that their own use never began until August 2016 (though this is also not supported by documents). From this, the District Court then concluded that there was "no evidence of confusion during earlier periods of coexistence," and referred to a "period of concurrent use" (i.e., of Appellant's 'PhillyWine' for its wine school and Appellees' 'Philly Wine School'). A31. ***But there was no concurrent use***. While the record reflects WSOP's own earliest written use of 'Philly Wine School' occurred in November 2024, the District Court credited WSOP with a priority date ***nineteen years earlier***, and continuous use over all those years, based solely on two alleged news articles from 2005 and 2017, both having extremely limited circulation and readership. As set forth below, the alleged articles are insufficient as a matter of law to establish that WSOP owned trademark rights in 'Philly Wine School' as of 2005. And, WSOP's other claims of use prior to 2024 rely on undocumented and unsubstantiated claims of verbal use, which are also insufficient as a matter of law to establish the rights Appellees claim to own.

#### 1. Two Uses of a Phrase in Third-Party Media Articles Twelve Years Apart Cannot Establish Trademark Rights As a Matter of Law

Given the authorities quoted above holding that trademark use must generally be made *by the entity claiming trademark rights*, the District Court erred in concluding that two third-party media articles, one from 2005 and the other from 2017, were sufficient to grant WSOP trademark rights "as early as 2005." A8–9.

It is settled law that a party's "first actual use in commerce . . . must be deliberate and continuous, not sporadic, casual or transitory." *Lucent*, 186 F.3d at 319. Indeed, as WSOP itself argued: "sporadic, casual, or transitory" use fails to satisfy the "continuous use" standard. *See* Case 2:26-cv-01268-JDW, Dkt. 25, at 16 of 35 (citing *Warren Pub. Co. v. Spurlock*, 645 F. Supp. 2d 402, 435 (E.D. Pa. 2009)). But the record shows only a single alleged third-party article from October 2005 that ostensibly refers to 'Philly Wine School' (A1926). In fact, the record contains no evidence showing *WSOP's* own use of the term 'Philly Wine School' for nearly twenty years thereafter. A1003, ¶ 38; A1256–82; A276–302; A1916, ¶ 67. As a matter of law, one alleged article from 2005 and another from 2017 cannot establish *continuous use* of a mark. Rather, the only logical way to describe those two uses—by third parties, twelve years apart—is "sporadic" and "transitory."

Citing controlling precedent, a district court in this Circuit held that "[i]solated newspaper references to 'UHS' also fail to establish continued use." *UHS of Delaware, Inc. v. United Health Services, Inc.*, 227 F. Supp. 3d 381, 402 (M.D. Pa. 2016). In that case,

defendants sought to turn the tables on plaintiff by arguing they were the senior user, but the court held that third-party use of their mark was insufficient *on its own* to establish continued use. *Id*. (noting "[t]he cases identified for this proposition found independent commercial use of the mark **by the owner** *in addition to* significant third-party usage within the relevant industry") (first emphasis added) (citing *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1577-78 (Fed. Cir. 1991)). *UHS* concluded that "unsolicited third-party references" cannot "constitute sufficient owner 'use,'" as this "would negate the requirement of deliberate commercial exploitation" by the owner. *Id*.; *Warren Pub. Co.*, 645 F. Supp. 2d at 435 (noting that "[m]inimal use of a mark [that] is not part of an 'ongoing program to exploit the mark' is insufficient to vest a party with trademark rights"); *Lucent*, 186 F.3d at 317 (concluding that there was no "'continuous commercial utilization' beyond the first sale" and that any "further promotional efforts" were not "sufficiently public to identify or distinguish the marked [services] in an appropriate segment of the public mind as those of the adopter of the mark"). Accordingly, two alleged obscure news articles from 2005 and 2017 that allegedly refer to 'Philly Wine School' are insufficient as a matter of law to show that WSOP continuously used "Philly Wine School" beginning in 2005.

### 2. The District Court Erred in Granting WSOP a Priority Date Before Its First Written Use in the Record in Nov. 2024, As Any Earlier Use Was Implicitly Verbal or Oral Use

Again, WSOP's own earliest use of 'Philly Wine School' *in writing* was on its website, dated November 23, 2024. A1003, ¶ 38; A1256–82; A276–302; A1158; A275.

Since two isolated third-party media references to 'Philly Wine School' twelve years apart do not suffice to establish trademark rights, the only other record evidence predating 2024 is Wallace's untested, written testimony that "consumers began colloquially referring to WSOP as 'the Philly Wine School'" (A1911, ¶ 21) and that WSOP's own first use of 'Philly Wine School' began "from about August 2016" (A1916, ¶ 67). But since the record reflects no written evidence of either of those claims, these alleged uses of 'Philly Wine School' by WSOP and by its consumers "colloquially," as only evidenced in writing by Wallace's after-the-fact declaration, cannot establish trademark use as a matter of law.

In *George & Co. LLC v. Imagination Entertainment Ltd.*, plaintiff George insisted "it has continuously used LEFT CENTER RIGHT as a mark since 1983" and argued that

> continued use is demonstrated through its own continuous verbal use of LEFT CENTER RIGHT since 1983. As this contention goes, since 1983, employees of George, in conversations with customers and other "word-of-mouth" marketing and selling, sometimes have referred to George's version of the Dice Game as LEFT CENTER RIGHT.

575 F.3d 383, 401 (4th Cir. 2009). But the Fourth Circuit roundly rejected this, noting:

> [W]e are aware of no case law supporting the proposition that a seller of goods who declines to use a mark as a trademark on the packaging of his goods obtains trademark rights in the mark through its own verbal use. Embracing such a verbal use doctrine would open the door to all varieties of claims where a party <u>**took no steps to use a mark on packaging**</u> to identify it as the source of the goods to potential customers.

*Id*. at 402 (emphasis added). The same reasoning applies here, even though WSOP sells services instead of goods. The *George* court explains how easy it should be for consumers to *see* the mark and identify it *as a mark*, citing many cases from around the country. *Id.*

This is why district courts in this Circuit impose a "requirement of deliberate commercial exploitation" by the owner. *UHS*, 227 F. Supp. 3d at 402; *Warren Pub. Co.*, 645 F. Supp. 2d at 435 (requiring an "ongoing program to exploit the mark"). The District Court erred by recognizing WSOP's trademark rights in its infringing term based solely on verbal use.

### C. The Opinion Erroneously Applied the *Lapp* Likelihood of Confusion Factors to the Facts Here, and its Weighing of those Factors was Legally Flawed Because of Its Misapplication of the Law

Is WSOP's use of 'Philly Wine School' likely to cause confusion with the longstanding use of "PhillyWine" and "phillywine.com" by a wine school? The District Court said no. In so ruling, the District Court erroneously applied the *Lapp* factors, and its weighing of those factors was legally flawed. Had the District Court correctly applied the law, it would have concluded that PhillyWine was likely to succeed on the merits of the second element of its trademark infringement claim.

The *Lapp* factors were originally designed "for cases involving non-competing products," but they are useful for determining likely confusion between directly competing services, and have been adapted to work for such cases, with those factors including:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Kos*, 369 F.3d at 709.

**1. The District Court Erred by Concluding That 'PhillyWine' For a Wine School is Not Confusingly Similar to 'Philly Wine School'**

The District Court correctly noted that "similarity may be the most important of the *Lapp* factors," and that it "should not conduct a 'side-by-side comparison,'" but should instead decide whether the two marks "'create the same overall impression when viewed separately.'" A27-28; *accord Lontex Corp. v. Nike, Inc.*, 107 F.4th 139 (3d Cir. 2024) (this factor considers "whether the 'average consumer, on encountering one mark in isolated circumstances of the [the] marketplace and having only a general recollection of the other, would likely confuse or associate the two") (quoting *Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 281 (3d Cir. 2001)). The District Court ignored those mandates, and ignored that trademark law views PhillyWine, for a wine school, as the same as 'Philly Wine School.'

It agreed both “marks share the terms ‘Philly’ and ‘Wine,” the “most recognizable” parts that “would likely draw a consumer’s attention.” A28. But it concluded that PhillyWine “is a single continuous term that functions as a brand name,” whereas ‘Philly Wine School’ is “a multi-word phrase that describes a type of business,” and the “inclusion of the word ‘School’ signals a particular category of services and” lends a “descriptive character that differs from [PhillyWine’s] more compact presentation.” *Id.*

That conclusion ignores that the term ‘School’ is generic for wine school services, which is exactly what both parties provide. A1164, A308, A2058; A1151, A403, A2063.[6] When a term is generic, it should be given significantly less weight in deciding if two marks have the “same overall impression,” as they do here. *Dranoff-Perlstein Associates v. Sklar*, 967 F.2d 852, 861-62 (3d Cir. 1992) (holding courts “should consider the likelihood of confusion between the two marks in their entireties, with the emphasis of the inquiry on the non-generic portions of the disputed marks”) (citing 2 McCarthy § 23:15). That is because “[t]wo names that look and sound similar will naturally seem even more similar where there are no differences in meaning to distinguish them.” *Kos*, 369 F.3d at 713. As this Court has stated: “when the dominant portions of the two marks are the same and the overall impression created by the marks is essentially the same 'it is very probable that the marks are confusingly similar.” *Checkpoint*, 269 F.3d at 281 (holding and agreeing with the district

[6] The District Court did not rule on PhillyWine’s Request for Judicial Notice, including the Office Action requiring “WINE SCHOOL” be disclaimed as generic. A2058, A1164, A308; A2047–49.

court that "the overall commercial impression of the parties' marks was confusingly similar" where a "dominant portion of each parties' trademark is the word 'Checkpoint,'" and while "Check Point Software has at times used the mark in slightly different forms including, 'Checkpoint' or 'Check Point,' the dominant features . . . are still the words 'check' and 'point'"—and since "'Systems,' 'Software,' 'Technologies,' and 'Inc.' are generic or descriptive terms," their "addition to the dominant terms 'check' and 'point' would not lead the average consumer to disassociate the products") (quoting *McCarthy* § 23:50 for the general rule that a later user cannot "avoid likely confusion by appropriating another's entire mark and adding descriptive" matter to it); *see Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 302 (D.N.J. 1998) (finding the plaintiff's mark 'Jews f#r Jesus' and the name of plaintiff's organization "virtually identical" to defendants' domain name).

*Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115-16 (7th Cir. 1997), is instructive here. That court agreed that it cannot merely look at the two marks side-by-side, and thus, "when the public does not encounter the two marks together, it is inappropriate to focus on minor stylistic differences," where in both marks, "the principal eye-catching word is 'Meridian,' followed closely by the word insurance." *Id*. (discounting minor differences in part where the mark is likely to be used in a vocal sense and through telephone calls); *see Ford Motor Co.*, 930 F.2d at 293 ("We recently held that "if the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar'") (quoting 2 McCarthy, Trademarks and Unfair Competition at §

23:7); *Am. Fid. & Liberty Ins. Co. v. Am. Fid. Grp.*, 2000 U.S. Dist. LEXIS 13863, at *19, *24-*26 (finding AMERICAN FIDELITY GROUP and AMERICAN FIDELITY & LIBERTY INSURANCE to be "virtually identical" and enjoining use of AMERICAN FIDELITY & LIBERTY where there were actual instances of confusion).

The District Court ignored Plaintiff's arguments and evidence that 'School' is generic and entitled to little weight and failed to even address that evidence in its Request for Judicial Notice. A2047–51, A2058, A2065–2545. It also failed to cite even one of the above-cited controlling cases on granting lesser weight to generic terms when deciding if two marks have the same overall impression. PhillyWine, used for a wine school, and 'Philly Wine School,' are virtually identical, but the District Court concluded that "this factor does not favor either party." A28. This is "[t]he single most important factor in determining likelihood of confusion," *Kos*, 369 F.3d at 712, and the District Court got it dead wrong.

#### 2. The District Court Erred in Concluding The Consumer Level of Care and Relatedness of Services Were Neutral, But the Services are Identical and Lower-Cost Classes for Consumers "with Less Deliberation" Control the Level of Care Analysis

The third *Lapp* factor considers the care consumers are expected to exercise when making purchasing decisions. The District Court found it neutral: WSET certification classes "require a financial and time commitment," but "both parties offer more casual, lower-cost classes that consumers may select with less deliberation," so the two considerations "offset one another." A35. But the District Court got the rule backwards. Where the buyer class is mixed, the Third Circuit measures care by the least sophisticated

consumer, not by averaging the sophisticated and unsophisticated together. Ford Motor Co., 930 F.2d at 293 ("when a buyer class is mixed, the standard of care . . . will be equal to that of the least sophisticated consumer in the class"); Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175, 186–87 (3d Cir. 2010) (applying that standard and remanding for judgment for the plaintiff). The District Court found that PhillyWine's customers encompass a mixed class of buyers consisting of both sophisticated and non-sophisticated purchasers, so the less deliberate consumers set the standard of care, and the factor clearly favors PhillyWine. By averaging the less deliberate consumers with the more careful ones, the District Court erred and applied the wrong standard.

The District Court further erred in finding the relatedness factor neutral. A35. Here, the parties' services are not just related; they are ***identical and directly competing***—both parties offer wine education services, in the same city, to the same consumers. Where services directly compete, confusion is especially likely, and a court "need rarely look beyond the mark itself." *Interpace Corp.*, 721 F.2d at 462; *accord A&H Sportswear*, 237 F.3d at 212. Identical, directly competing services are as related as services can be: a consumer who sees two wine schools using the same or nearly identical names will certainly assume a single source. A neutral finding cannot be reconciled with the District Court's own recognition that both parties "offer wine education services . . . in the same geographic market." A33. This factor clearly favors PhillyWine.

### 3. The District Court Misapplied the *Lapp* Factor on Actual Confusion, Erroneously Concluding That Only Point-of-Sale Confusion is Actionable Where No Confused Party Enrolled "in the Wrong Program" or "Paid The Wrong Provider"

The District Court misapplied the sixth *Lapp* factor of actual confusion, which is particularly problematic because actual confusion evidence is difficult to find, especially at the preliminary injunction stage. For this reason, evidence of actual confusion presented in support of a motion for preliminary injunction is powerful, "highly probative" evidence of likely confusion. *Kos*, 369 F.3d at 720; *see Country Floors, Inc. v. P'ship of Gepner & Ford*, 930 F.2d 1056, 1064 (3d Cir. 1991) (finding "very little proof of actual confusion would be necessary to prove likelihood of confusion").

The record showed three instances of actual confusion. First, on December 2, 2025, a prospective student emailed Allen about an event advertised as 'Philly Wine School,' saying he "thought it was your school" before realizing "this was for the other school, the Wine School of Philadelphia." A1005, ¶ 52; A1027; A430. Second, a purported reviewer who was never PhillyWine's student complained on its Google listing that it was "not located where they claim"—a complaint only a confused consumer could make. A1005–06, ¶ 53; A1029. Third, Kelly Daniels declared that she avoided PhillyWine's classes based on her mistaken belief about the two schools' affiliation, only learning of her confusion after the *Inquirer* wrote an article about this lawsuit. A3602–04, ¶¶17-18; A3657, ¶ 14.

The District Court discounted these on the grounds that none showed a consumer who enrolled "in the wrong program" or "paid the wrong provider." A30-31. This is the

precise error the Third Circuit has reversed before, where a district court limited actionable confusion to "actual customer" or point-of-sale confusion; in one case, this Court vacated, holding an "overly narrow interpretation of the kind of confusion" actionable under the Lanham Act to be legal error. *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 317–19 (3d Cir. 2015). Confusion need not cause a completed sale: a prospective student *nearly* enrolling at the wrong school, a misdirected complaint, and a diverted consumer are all actionable source confusion, sale or no sale. *See McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357–58 (3d Cir. 2007) (holding "initial interest confusion is actionable under the Lanham Act" even where "no actual sale is finally completed"); *Kos*, 369 F.3d at 711 (Lanham Act confusion is "not merely of purchasers" and reaches non-purchasers too); *800–JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 290 (D.N.J. 2006) (initial-interest confusion actionable "even . . . where no actual sale occurs"); *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 300–01 (E.D. Pa. 2000) (crediting actual confusion as to "the source or sponsorship" of services among non-purchasers, including a professor, students and parents). The District Court applied a rule that this Court has repeatedly rejected.

The District Court also gave the evidence of actual confusion insufficient weight. Actual confusion is hard to find, so the Third Circuit treats even a few instances as significant: such evidence is "substantial evidence of likelihood of confusion," and its rarity makes even isolated incidents "highly probative." *Kos*, 369 F.3d at 720; *Country*

*Floors, Inc.*, 930 F.2d at 1064. Rather than finding the evidence of actual confusion "highly probative" as it was required to do, the District Court fully discounted two of the three instances and completely ignored or overlooked Kelly Daniels' declaration.

#### 4. The District Court Misapplied the *Lapp* Factors on Actual Confusion, Erroneously Relying on WSOP's So-Called "Concurrent Use" Falsely Dating Back to 2005

The District Court's application of the fourth factor—length of use without confusion—was likewise erroneous. The District Court credited WSOP with roughly two decades of "concurrent use" without confusion, treating the absence of confusion "during earlier periods of coexistence" as evidence against PhillyWine. A31. But as discussed above, **<u>there was no such coexistence</u>**: the record clearly shows WSOP itself made no written use of 'Philly Wine School' until November 23, 2024, and two stray articles from 2005 and 2017 do not establish continuous or exclusive use, let alone twenty years of it. A1003, ¶ 38; A1256–82; A276–302; A1926; A2011–13. The real period of coexistence with 'Philly Wine School' is a matter of months beginning in late 2024, and most confusion appeared soon thereafter. A1005–06, ¶¶ 52–53; A1027; A430; A1029. When measured from WSOP's first actual use, these two confusion factors strongly favor PhillyWine.

#### 5. The District Court Erred in Its Analysis of the Intent Factor

The District Court correctly noted that this factor examines WSOP's intent, and that a "defendant's 'intentional, willful and admitted adoption of a mark closely similar to the existing marks' may provide strong evidence of" likely confusion. A31 (quoting

*Checkpoint*, 269 F.3d at 286). It also correctly found the record reflecting "that the Wine School was aware of PhillyWine's business." A32. Despite acknowledging that "intentional, willful and admitted adoption" of an identical mark strongly favors a plaintiff, the District Court ignored exactly that type of evidence.

Wallace viewed himself as a "rival" to Ewing and sought to antagonize Ewing. A999, ¶ 25; A1104–09; A410; A1768, ¶ 7 (Charles Austermuhl attesting when he taught with Ewing, "Wallace would do things to try to get [Ewing] to engage in some kind of back and forth, as if there was a rivalry between them," and he "denigrated [Ewing] or PhillyWine"). More importantly, Allen, one of PhillyWine's owners—who took more than a dozen WSOP courses between 2013 and 2016 and worked there as an events coordinator—attested in February 2026 that on November 1, 2018, Wallace expressly told her he "took the Instagram handle @PhillyWine to mess with or upset Neal," so that when "people are looking for him," "they're gonna find me"; and that he would call and email Ewing pretending to be prospective PhillyWine students "just to mess with" Ewing. A1286–87, ¶¶ 5, 7, 11. Wallace's perceived rivalry with Ewing reveals his desire to trade off of PhillyWine's goodwill, as evidenced by his admittedly intentional and willful adoption of the Instagram handle @PhillyWine to divert students from PhillyWine, *see Checkpoint*, 269 F.3d at 286—but the District Court failed to even mention this in its Opinion. A31-33. Wallace had every opportunity in his own declaration filed in March 2026 to refute Allen's testimony, but failed to do so. A1909-

21. And, the record reflects that Wallace's adoption of the @PhillyWine Instagram handle directly caused Kelly Daniels to experience actual confusion, and to avoid taking classes with PhillyWine based on her mistaken belief that Wallace was affiliated with it. A3604, ¶ 17; A3657, ¶ 14. Accordingly, the record established WSOP's willful intent, and the District Court erred by holding that this factor does not favor PhillyWine.

### 6. Where the Marketing Channels, Advertising Media and Target Customers All Directly Overlap, the District Court Erred in Not Decisively Finding These Factors Weigh Strongly for Plaintiff

The seventh *Lapp* factor asks "whether the parties market their services through the same channels of trade and advertise through similar media," which includes how the parties "reach consumers through advertising and sales efforts," while the eighth *Lapp* factor asks "whether the parties seek to attract the same class of consumers." A33 (citing *Kos*, 369 F.3d at 722, *Checkpoint*, 269 F.3d at 288-89 and *A&H Sportswear,* 237 F.3d at 215). The District Court correctly noted that "the parties' marketing channels and target customers overlap in various ways," where both "offer wine education services . . . in the same geographic market," each one promotes those "offerings through similar means, including websites, social media platforms such as Instagram, online listings and email outreach," and that both "appear in search results and on third party platforms that aggregate local businesses and educational offerings." A33-34.

Despite all that, the District Court concluded these factors weigh only "slightly" in PhillyWine's favor and that "differences in emphasis and branding limit the strength of that

conclusion" because the parties purportedly "present their offerings differently," with PhillyWine emphasizing "structured [WSET] certification programming," while WSOP allegedly focuses "more on consumer-oriented classes and events" and "maintained a more consistent physical location." A34, First, there is no law or authority holding that having "maintained a more consistent physical location" has any bearing on either of these factors, and the District Court cites no case supporting that claim. Second, while the District Court said Appellees "focus" on consumer-oriented classes, the undisputed evidence shows that ***both*** parties offer beginner wine classes to casual consumers as well as formal courses for, in WSOP's own words on its website, "professionals seeking to earn credentials and work in the wine trade." A195–96; A2550 ¶ 27; A3546–51; A121.

In short, both parties offer wine education services to identical classes of consumers (both casual consumers and wine industry professionals), using identical online marketing methods like Instagram. The District Court erred by concluding these factors only weigh "slightly" in PhillyWine's favor; they weigh ***strongly*** in its favor.

### 7. The District Court Erred by Concluding That 'PhillyWine' is Not a Strong Mark in View of Its Longtime Exclusive Use and Extensive Evidence of Marketplace Recognition

The second *Lapp* factor measures the strength of the plaintiff's mark, which this Circuit evaluates in two ways: a mark's conceptual strength (its inherent distinctiveness) and its commercial strength (its recognition in the marketplace). *Sabinsa,* 609 F.3d at 184; *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 479 (3d Cir. 1994).

Commercial strength is a legal determination based on facts, as evidenced by advertising, sales, the length and exclusivity of use, and consumer recognition—and it is assessed independently of where the mark falls on the conceptual spectrum (i.e., whether the mark is fanciful, arbitrary, suggestive, or descriptive). A mark may be commercially strong, and entitled to broad protection, even if it is conceptually weak. The District Court concluded that Appellant's mark is not strong because it "lacks demonstrated marketplace recognition." A35. That conclusion is again based on the wrong legal analysis.

The District Court wrongly formulated the legal issue as if WSOP could be enjoined only if Appellant established rights in the exact mark WSOP was using. *See* A29-30 (finding Appellant's evidence of "years of operation, revenue, customer base and marketing efforts" proved that Appellant runs "a successful business," but not "that consumers associate the asserted marks—particularly 'Philly Wine School'—with" Appellant). The District Court's error of narrowly focusing on Appellant's evidence only as to 'Philly Wine School' meant that it failed to attribute all of the evidence of growth and success in the mark 'PhillyWine' to Appellant.

When measured against the right mark, the record shows substantial commercial strength—and any descriptiveness of the PhillyWine Marks is a non-issue as commercial strength turns on marketplace recognition, not conceptual classification. *A&H Sportswear*, 237 F.3d at 221–22. Appellant has been using the PhillyWine Marks for twenty-five years continuously and—but for Appellees' token use beginning in late

2024—exclusively. A992–93, A104–05; A996–98, ¶¶ 12–19; A2547–48, ¶¶ 4–8; A2556–3455. Under the PhillyWine Marks, Appellant has taught more than 5,600 students, earned over $4 million, and spent hundreds of thousands of dollars on advertising, A997–98, ¶¶ 16, 19); twenty-four declarants attested that they recognize 'PhillyWine' and associate it with Appellant, A1722–49, A1751–66 (customer declarations); A1768–77, A1792-93 (industry declarations); and the site's twenty-five-year website archive displays 'PhillyWine' and its variants more than 1,550 times, A2547, ¶ 7; A2556–3455. This level of marketplace recognition establishes commercial strength, which turns on whether consumers recognize the mark as identifying a particular provider. *Fisons*, 30 F.3d at 479; *A&H Sportswear*, 237 F.3d at 224. The District Court thus failed to analyze the evidence as to the PhillyWine Marks. When properly measured, this factor clearly favors Appellant.

## III. In the Balance of Equities Analysis, the District Court Erred by Granting a Presumption of Validity to WSOP's Fraudulent Trademark Registration

Although the District Court found that PhillyWine had "shown a likelihood of irreparable harm," A37, it denied relief in part because it concluded that the balance of equities favored WSOP. A39. The District Court reached that conclusion by crediting WSOP's fraudulently obtained federal registration for its infringing PHILLY WINE SCHOOL mark at full statutory strength—i.e., treating it as a registration that "remains valid" and carries "a presumption of validity and an exclusive right to use the mark in commerce"—while declining to analyze PhillyWine's argument and record evidence that

WSOP obtained that registration through knowingly false statements. A21 n.4; A39. That was legal error. A registration is of course entitled to a statutory presumption of validity but that presumption is rebuttable, not conclusive, and a court weighing the equities may not treat it as dispositive while disregarding record evidence that the registration was procured by fraud. Whether the District Court gave WSOP's registration greater effect than the presumption permits is a question of law subject to plenary review. *Kos*, 369 F.3d at 708.

### A. The District Court Tipped the Equities to WSOP Based on the Presumption of Validity Attached to Its Registration

In weighing the equities, the District Court reasoned that an injunction would require KSWCO "to unwind enforcement efforts taken in reliance on a federal trademark registration that remains valid and has not been invalidated." A39. The District Court emphasized that the registration carries "a presumption of validity and an exclusive right to use the mark in commerce for the listed services," and concluded that enjoining WSOP's use of the registered mark would deprive it of rights the law recognizes. *Id*. The Court's equitable analysis therefore turned entirely on that presumption.

### B. A Registration Procured by Fraud Is Not Entitled to Dispositive Weight in the Balance of Equities

The presumption is not conclusive. A registration is only "prima facie evidence" of the validity of the mark and of the registrant's exclusive right to use it, and by its terms it does "not preclude another person from proving any legal or equitable defense or defect" that could have been asserted had the mark never been registered. 15 U.S.C. §

1115(a). Fraud in procuring the registration is such a defect, *id.* § 1115(b)(1), a registration obtained fraudulently is subject to cancellation at any time, *id*. § 1064(3), and in a civil action involving a registered mark, the court is empowered to order its cancellation, *id*. § 1119. Fraud on the USPTO occurs where an applicant knowingly makes a false, material representation with the intent to deceive the Office. *See In re Bose Corp*., 580 F.3d 1240, 1245 (Fed. Cir. 2009); *Chutter, Inc. v. Great Mgmt. Grp*., LLC, 2021 WL 4494251 at *6 (TTAB 2021) (*rev'd on other grounds*, 90 F.4th 1333 (Fed. Cir. 2024)) ("as a matter of law [] reckless disregard satisfies the requisite intent for fraud on the USPTO in trademark matters"); *Ruifei (Shenzhen) Smart Tech. Co., Ltd*., 2024 WL 3423957, at *8 (TTAB July 2, 2024) (confirming "*Chutter* remains applicable precedent on proof of deceptive intent in the form of reckless disregard of the truth or falsity of inaccurate statements to the USPTO").[7] A registration challenged as fraudulently obtained therefore cannot be treated as though it were unimpeachable. Equity looks to the conduct of the party invoking it. A defendant whose asserted rights flow from its own bad faith "can hardly claim to be harmed" by an injunction, because it "brought any and all difficulties occasioned by the issuance of an injunction upon itself." *Opticians*, 920 F.2d at 197. Here, the District Court erred by according a registration dispositive weight while disregarding the evidence in the record demonstrating that the registration was procured by deception.

---

[7] *U.S. ex rel. Schutte v. SuperValu Inc*., 598 U.S. 739, 750 (2023) (finding the False Claims Act's use of "knowingly" can include deliberate ignorance or "reckless disregard of the truth or falsity," which tracks the common law scienter requirement for fraud).

### C. The Record Established That WSOP Procured the Registration Based on Evidence of Appellant's Use Through Knowingly False Statements, and the District Court Refused to Consider That Evidence

The record before the District Court contained substantial, specific documentary evidence that WSOP obtained its federal registration by misrepresenting material facts to the USPTO. After the USPTO refused the PHILLY WINE SCHOOL mark as merely descriptive (and "WINE SCHOOL" as generic), KSWCO sought to register its mark under Section 2(f), representing that the mark had acquired distinctiveness "through nearly two decades of continuous use, ... independent press recognition, and substantially exclusive use." A1003, ¶ 36; A1169; A313. The record refutes that representation. WSOP offered no documentary evidence of its ***own*** use of 'Philly Wine School' predating the application; the phrase does not appear ***in writing*** anywhere ***by Appellees***, whether online or in print, until it first appeared on their vinology.com website from November 23, 2024—the very day they filed—even though they told the USPTO they had a first use date of August 2016 (and to support their 2(f) claim "nearly two decades" of use). A1002–03, ¶¶ 34, 36–38; A1150–58, A270–75, A402–04; A1256–82, A276–302.

Two of the "third-party" references WSOP offered as proof of its own use and distinctiveness in fact reflected PhillyWine's use. WSOP submitted the biography of instructor Susan Lynham—who teaches for PhillyWine and never taught for WSOP—stating that she "currently teaches at the Philly Wine School," and a Reddit post describing a "WSET in-person course" that "at the Philly wine school," even though

WSOP offers no WSET courses and this could only have described PhillyWine. A1003–04, ¶¶ 39–43; A1181; A325; A1184, A328. Wallace also falsely attested, under oath, that "no other persons . . . have the right to use the mark in commerce," despite Wallace's documented, longstanding knowledge of PhillyWine's use of the PhillyWine Marks for the same services. A1002, ¶ 34; A998–99, ¶¶ 21–25; A1155, A272.

The District Court did not weigh ***any*** of this in its equitable analysis. Indeed, it acknowledged the parties both "spen[t] substantial time debating whether KWSCO's federal registration of 'Philly Wine School' is valid, but that dispute doesn't seem to matter" A21 n.4, before, eighteen pages later, deciding the unanalyzed presumption of validity controls the outcome. A39, This is clearly erroneous.

The District Court invoked the registration as decisively tipping the equities in favor of WSOP, without adjudicating the evidence of its fraudulent procurement, or considering the lack of ***any*** written evidence ***from WSOP*** showing ***its*** own alleged use of 'Philly Wine School' predating 2024, much less in 2016 or 2005. While a court may defer final adjudication of validity, the District Court declining to assess the validity of WSOP's registration, while also treating it as conclusively valid, was a clear legal error.

### D. Properly Weighed, the Equities Do Not Favor WSOP

When the fraud evidence is properly weighed, the equitable balance cannot rest on a presumption of validity. A party cannot invoke, as a shield against a competitor, trademark rights it obtained through deception—particularly where, as here, it did so by

relying on Appellant's own evidence of use. And Wallace acted with the intent to deceive the USPTO: a party does not by innocent mistake submit its competitor's own instructor biography, and a post describing courses only its competitor offers, as proof of its own distinctiveness. *Covertech Fabric., Inc. v. TVM Bldg. Prods., Inc.*, 855 F.3d 163, 174–75 (3d Cir. 2017) (finding applicant intended to deceive the USPTO when he falsely attested that "he believed no other person [or company had] the right to use the mark").

At a minimum, the District Court's failure to examine or even consider the validity of WSOP's registration infected its legal analysis and balancing of the hardships and requires reversal. The District Court found that PhillyWine will suffer irreparable harm. A37–39. And as set forth above, PhillyWine is likely to succeed on the merits. The registration cannot carry the equities, because the record shows it was obtained by fraud. Set it aside, and every preliminary injunction factor favors PhillyWine.

The evidence of WSOP's fraud strongly undermines Wallace's credibility. The District Court's failure to consider that evidence amounts to legal error. *See Arrowpoint*, 793 F.3d at 326 (holding "despite credibility questions, the District Court failed to hold an evidentiary hearing, or to adequately set forth its rationale for discounting [Plaintiff's] evidence, or to hear oral argument," and on 'this record, those failings amount to error").

## IV. The District Court Correctly Concluded PhillyWine Showed Irreparable Harm, Underscoring the Urgent Need for Relief, But Failed to Extend the Legally Required Presumption of Harm Based on Outdated Case Law

Underscoring PhillyWine's urgent need for relief, the District Court found that

PhillyWine has suffered irreparable harm from Appellees' conduct in "enforcing" their trademark registration resulting in PhillyWine's loss of its Instagram account. A37–39; *accord Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800,805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will"). And since PhillyWine is likely to succeed on the merits, it is further entitled to a presumption of irreparable harm.[8]

## V. An Injunction Is In the Public Interest

The public interest favors injunctive relief when a plaintiff has a likelihood of success and irreparable harm. *See Johnson v. Wetzel*, 209 F.Supp.3d 766 (2016); *see also Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994). Moreover, in "a trademark case, the public interest is most often a synonym for the right of the public not to be deceived or confused.' Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." S*&R Corp. v. Jiffy Lube Int'l, Inc*., 968 F.2d 371, 379 (3d Cir. 1992).

[8] The District Court committed legal error, stating a party "is not entitled to a presumption of irreparable harm but rather is required to demonstrate" such harm. A37 (citing *Ferring,* 765 F.3d at 210). While that was true in 2014 when the Third Circuit decided *Ferring*, Congress passed the Trademark Modernization Act of 2020 (TMA) which reinstituted a rebuttable presumption of harm. *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 183-84 (3d Cir. 2022); *see Trial Lawyers College v. Gerry Spence Trial Lawyers College at Thunderhead Ranch*, 23 F.4th 1262, 1270 (10th Cir. 2022) (citing the *Ferring* case as superseded by the TMA). The District Court thus committed legal error by relying on *Ferring*'s outdated standard, which now conflicts with 15 U.S.C. § 1116(a).

This factor weighs strongly in PhillyWine's favor. Wallace has exhibited an unequivocal pattern of conduct, for decades, in which he (1) misappropriated the customers or goodwill of others;[9] (2) falsely claimed to have credentials he never earned;[10] and (3) weaponized internet anonymity to fraudulently promote himself and his business, including by (a) fabricating "affiliations" that do not exist between his business and those of others;[11] and (b) writing vanity pieces about himself and/or his businesses under the guise of people who do not exist[12]—all solely to benefit Wallace, to the detriment of others. Permitting Wallace to continue such fraudulent behavior that deceives consumers clearly disserves the public interest, as does his after-the-fact fraudulent registration of 'Philly Wine School' made solely to interfere with PhillyWine's business, merely because it truthfully and generically referred to itself as a "wine school."

## CONCLUSION

For all of the foregoing reasons, the Court should reverse the District Court and order it to issue a preliminary injunction on an expedited basis. *Kos*, 369 F.3d at 732.

---

[9] *See* A1770, ¶ 9; A1776–77, ¶¶ 9–14; A1778–91.
[10] *See* A1774–75, ¶ 8; A1772, ¶ 9; A1771, ¶ 10; A1291, ¶¶ 3–6; A1298–1306, A1468–77.
[11] *See* A1776–77, ¶¶ 9–14; A1778–91; A1293–97, ¶¶ 20–42, 45–46, 52–55 and exhibits cited therein.
[12] *See* A1291–97, ¶¶ 7–55 and exhibits cited therein.

**GREENBERG TRAURIG, LLP**

Dated: September 28, 2026

/s/ *Brian T. Feeney*

Brian T. Feeney, Esq.
**GREENBERG TRAURIG, LLP**
1717 Arch Street, Suite 400
Philadelphia, PA 19103
215-988-7812
brian.feeney@gtlaw.com

Ian C. Ballon, Esq.
**GREENBERG TRAURIG, LLP**
1900 University Avenue, 5th Floor
East Palo Alto, CA 94303
ballon@gtlaw.com

Barry Horwitz, Esq.
Marc Trachtenberg, Esq.
**GREENBERG TRAURIG, LLP**
360 North Green Street, Suite 1300
Chicago, IL 60607
barry.horwitz@gtlaw.com
trachtenbergm@gtlaw.com

**CERTIFICATE OF SERVICE**

I, Brian T. Feeney, hereby certify that on September 28, 2026, an electronic copy of Appellant's Brief was served by notice of electronic filing via this Court's CM/ECF system upon all counsel of record.

Upon notification that the electronically-filed Brief has been accepted as sufficient, ten (10) hard copies of this Brief will be submitted to the Clerk. See L.A.R. 31.1.

*/s/ Brian T. Feeney*

Brian T. Feeney

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND CERTIFICATION OF IDENTICAL COMPLIANCE OF BRIEFS WITH LOCAL RULE 31.1**

1. This brief complies with the word limits of Fed. R. App. P. 32(a)(7)(B) because it contains 12794 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font for text and 12 point font for footnotes.

3. This brief complies with the privacy redaction because it has been redacted of any personal data identifiers.

4. This brief complies with the electronic submission requirement, because it will be an exact copy of the paper document.

5. The brief is free of viruses because it has been scanned for viruses with the most recent version of the firm's scanning program.

Dated: September 28, 2026

*/s/ Brian T. Feeney*
Brian T. Feeney

## CERTIFICATE OF BAR MEMBERSHIP

I, Brian T. Feeney, hereby certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

*/s/ Brian T. Feeney*
Brian T. Feeney

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

**CASE NO. 26-2423**

---

**PHILLYWINE LLC, a Pennsylvania Limited Liability Company,**
***Plaintiff / Appellants,***

**v.**

**KSWCO LLC, a Delaware Limited Liability Company, SALKEDS LLC, a Delaware Limited Liability Company, THE NATIONAL WINE SCHOOL LLC, a Pennsylvania Limited Liability Company, ALANA ZERBE, an individual, and KEITH WALLACE, an individual, d/b/a Wine School of Philadelphia,**
***Defendants / Appellees.***

---

On appeal from the Order entered in the United States District Court for the Eastern District of Pennsylvania in Case No. 2:26-cv-01268
The Honorable Joshua D. Wolson

---

**APPELLANT'S APPENDIX, VOLUME I**

**GREENBERG TRAURIG, LLP**
Ian C. Ballon, Esq.
Brian T. Feeney, Esq.
**GREENBERG TRAURIG, LLP**
1717 Arch Street, Suite 400
Philadelphia, PA 19103
215-988-7800
ballon@gtlaw.com
brian.feeney@gtlaw.com

# TABLE OF CONTENTS

**Volume I**

**Document** **Page**

Plaintiff / Appellant's Notice of Appeal ............ App. 0001

Trial Court's Order (Wolson, J.)(ECF 34) ............ App. 0004

Trial Court's Memorandum (Wolson, J.)(ECF 33) ............ App. 0005

**Volume II**

**Document** **Page**

Trial Court's Docket ............ App. 0041

Plaintiff / Appellant's Complaint with supporting Exhibits, dated February 26, 2026 (ECF 1) ............ App. 0048

- Exhibit 1 (ECF 1-3) ............ App. 0103
- Exhibit 2 (ECF 1-4) ............ App. 0161
- Exhibit 3 (ECF 1-5) ............ App. 0166
- Exhibit 4 (ECF 1-6) ............ App. 0177
- Exhibit 5 (ECF 1-7) ............ App. 0179
- Exhibit 6 (ECF 1-8) ............ App. 0191
- Exhibit 7 (ECF 1-9) ............ App. 0226
- Exhibit 8 (ECF 1-10) ............ App. 0238
- Exhibit 9 (ECF 1-11) ............ App. 0251
- Exhibit 10 (ECF 1-12) ............ App. 0270
- Exhibit 11 (ECF 1-13) ............ App. 0276
- Exhibit 12 (ECF 1-14) ............ App. 0303
- Exhibit 13 (ECF 1-15) ............ App. 0312
- Exhibit 14 (ECF 1-16) ............ App. 0398
- Exhibit 15 (ECF 1-17) ............ App. 0402
- Exhibit 16 (ECF 1-18) ............ App. 0405
- Exhibit 17 (ECF 1-19) ............ App. 0407
- Exhibit 18 (ECF 1-20) ............ App. 0419
- Exhibit 19 (ECF 1-21) ............ App. 0427
- Exhibit 20 (ECF 1-22) ............ App. 0429
- Exhibit 21 (ECF 1-23) ............ App. 0442
- Exhibit 22 (ECF 1-24) ............ App. 0445
- Exhibit 23 (ECF 1-25) ............ App. 0449
- Exhibit 24 (ECF 1-26) ............ App. 0494
- Exhibit 25 (ECF 1-27) ............ App. 0500
- Exhibit 26 (ECF 1-28) ............ App. 0507

- Exhibit 27 (ECF 1-29) ............ App. 0518
- Exhibit 28 (ECF 1-30) ............ App. 0524
- Exhibit 29 (ECF 1-31) ............ App. 0537
- Exhibit 30 (ECF 1-32) ............ App. 0548
- Exhibit 31 (ECF 1-33) ............ App. 0568
- Exhibit 32 (ECF 1-34) ............ App. 0597
- Exhibit 33 (ECF 1-35) ............ App. 0713
- Exhibit 34 (ECF 1-36) ............ App. 0774
- Exhibit 35 (ECF 1-37) ............ App. 0786
- Exhibit 36 (ECF 1-38) ............ App. 0793
- Exhibit 37 (ECF 1-39) ............ App. 0799
- Exhibit 38 (ECF 1-40) ............ App. 0887
- Exhibit 39 (ECF 1-41) ............ App. 0901
- Exhibit 40 (ECF 1-42) ............ App. 0918
- Exhibit 41 (ECF 1-43) ............ App. 0925
- Exhibit 42 (ECF 1-44) ............ App. 0945
- Exhibit 43 (ECF 1-45) ............ App. 0967
- Exhibit 44 (ECF 1-46) ............ App. 0982

Plaintiff / Appellant's Motion for Preliminary Injunction with supporting Exhibits, dated February 27, 2026 (ECF 6) ............ App. 0986

- Exhibit 1 (ECF 6-3) ............ App. 0991
- Exhibit 2 (ECF 6-4 and 6-5) ............ App. 0994
- Exhibit 3 (ECF 6-6) ............ App. 1285
- Exhibit 4 (ECF 6-7, 6-8 and 6-9) ............ App. 1290
- Exhibit 5 (ECF 6-10) ............ App. 1721
- Exhibit 6 (ECF 6-11) ............ App. 1750
- Exhibit 7 (ECF 6-12) ............ App. 1767
- Exhibit 8 (ECF 6-13) ............ App. 1816

Order regarding Recusal (Wolson, J.), dated March 4, 2026 (ECF 18) ............ App. 1906

Defendants' / Appellees' Exhibit 1 in Support of Response in Opposition to Plaintiff / Appellant's Motion for Preliminary Injunction with supporting Exhibits, dated March 16, 2026 (ECF 25-1) ............ App. 1908

Trial Court's Order Scheduling Hearing on Motion for Preliminary Injunction, dated March 17, 2026 (ECF 27) ............ App. 2046


**Volume III**

**Document** **Page**


Plaintiff / Appellant's Request for Judicial Notice in Support of its Motion for Preliminary Injunction with supporting Exhibits, dated March 25, 2026 (ECF 29) ............ App. 2047

- Exhibit 1 (ECF 29-2) ............ App. 2053
- Exhibit 2 (ECF 29-3) ............ App. 2062

- Exhibit 3 (ECF 29-4) ........ App. 2065
- Exhibit 4 (ECF 29-5) ........ App. 2123

Plaintiff / Appellant's Exhibit 9 in Support of Reply Brief in Support of its Motion for Preliminary Injunction with supporting Exhibits, dated March 25, 2026 (ECF 30-1, 30-2, 30-3 and 30-4) ........ App. 2816

Plaintiff / Appellant's Exhibit 10 in Support of Reply Brief in Support of its Motion for Preliminary Injunction with supporting Exhibits, dated March 25, 2026 (ECF 30-5) ........ App. 3601

Plaintiff / Appellant's Exhibit 11 in Support of Reply Brief in Support of its Motion for Preliminary Injunction with supporting Exhibits, dated March 25, 2026 (ECF 30-6) ........ App. 3655

Plaintiff's / Appellant's Letter to Judge Wolson Requesting Oral Argument, dated April 3, 2026 ........ App. 3805

Defendants' / Appellees' Letter to Judge Wolson Opposing Remote Oral Argument, dated April 6, 2026 ........ App. 3806

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PHILLYWINE LLC, a Pennsylvania Limited Liability Company,<br><br>*Plaintiff,*<br><br>v.<br><br>KSWCO LLC, a Delaware Limited Liability Company, SALKEDS LLC, a Delaware Limited Liability Company, THE NATIONAL WINE SCHOOL LLC, a Pennsylvania Limited Liability Company, ALANA ZERBE, an individual, and KEITH WALLACE, an individual, d/b/a Wine School of Philadelphia,<br><br>*Defendants.* | No. 2:26-cv-01268 |

**PLAINTIFF'S NOTICE OF APPEAL**

Plaintiff, PhillyWine LLC, hereby appeals to the United States Court of Appeals for the Third Circuit from the Court's May 26, 2026 Order [Dkt. No. 34] denying its Motion for Preliminary Injunction, together with any orders, judgments, and rulings prior or subsidiary thereto or subsumed therein, including but not limited to the Court's May 26, 2026 Memorandum [Dkt. No. 33].

**GREENBERG TRAURIG, LLP**

Dated: June 5, 2026

*/s/ Brian T. Feeney*

Brian T. Feeney, Esq.
**GREENBERG TRAURIG, LLP**
1717 Arch Street, Suite 400
Philadelphia, PA 19103
215-988-7812
brian.feeney@gtlaw.com

Ian C. Ballon, Esq. (admitted *Pro Hac Vice*)
**GREENBERG TRAURIG, LLP**
1900 University Avenue, 5th Floor
East Palo Alto, CA 94303
ballon@gtlaw.com

Barry Horwitz, Esq. (admitted *Pro Hac Vice*)
Marc Trachtenberg, Esq. (admitted *Pro Hac Vice*)
Molly Carr, Esq. (admitted *Pro Hac Vice*)
**GREENBERG TRAURIG, LLP**
360 North Green Street, Suite 1300
Chicago, IL 60607
barry.horwitz@gtlaw.com
trachtenbergm@gtlaw.com
carrm@gtlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 5, 2026, I caused a true and correct copy of the foregoing Notice of Appeal to be served via the Court's CM/ECF system upon all counsel of record.

*/s/ Brian T. Feeney*
Brian T. Feeney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHILLYWINE LLC**,<br>*Plaintiff*,<br>v.<br>**KSWCO, LLC et al.**,<br>*Defendants*. | **Case No. 2:26-cv-01268-JDW** |

**ORDER**

**AND NOW**, this 26th day of May, 2026, for the reasons set forth in the accompanying Memorandum, it is **ORDERED** that Plaintiff PhillyWine LLC's Motion For Preliminary Injunction (ECF No. 6) is **DENIED**.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PHILLYWINE LLC**,<br><br>*Plaintiff*,<br><br>v.<br><br>**KSWCO, LLC et al.**,<br><br>*Defendants*. | **Case No. 2:26-cv-01268-JDW** |

**MEMORANDUM**

In both winemaking and trademark law, subtle distinctions can lead to different outcomes. Geography, use, history, and even marketing can make all the difference. This case arises from a dispute between two Philadelphia businesses that teach people about wine, and now they have a fight about whether one of them has shown protectable rights in the phrase "Philly Wine School." While Philly Wine LLC claims to have senior rights in the mark as compared to the Wine School of Philadelphia ("Wine School"),[1] it has not made a showing to demonstrate that its likely to prevail on that claim. At best, it has shown that it and its predecessor business have used the term sporadically until the last couple of years, while the Wine School has used the term for close to a decade. On the record before me, I therefore conclude that a preliminary injunction is not appropriate.

[1] The Defendants in this case are KSWCO LLC, Salkeds LLC, The National Wine School LLC, and Keith Wallace. For the most part, PhillyWine does not distinguish between them, so throughout this opinion, I will refer to them collectively as the "Wine School," unless there is a need to distinguish among them.

# I. BACKGROUND

## A. Factual History

### 1. PhillyWine

Neal Ewing operated a sole proprietorship in Philadelphia that offered wine courses, tastings, and certification programs. Mr. Ewing's program became an approved provider of Wine & Spirit Education Trust ("WSET") courses in 1999, allowing it to deliver standardized curriculum and administer examinations leading to globally recognized credentials. In 2001, Mr. Ewing registered the domain phillywine.com, and that domain has served as the business's primary website and communication platform since that time. Over the next two decades, Mr. Ewing had a sustained presence in the Philadelphia wine education market. His program offered instruction across multiple levels and attracted students locally and from outside the region. The business did not operate from a fixed location. Instead, Mr. Ewing held classes at a variety of venues, including restaurants, event spaces, and academic institutions.

Mr. Ewing appears to have marketed his services under different names, but the most common was "Neal Ewing Wine Services." As recently as 2022 and 2023, industry materials and publications referred to the program as "Neal Ewing Wine Services." (ECF No. 25-1 at 49-53.) From at least 2008 through 2022, the phillywine.com website likewise identified the business as operating "as Neal Ewing Wine Services" since 1988. (*Id.* at 41, 46.)

In 2022, Mr. Ewing retired. His daughter and son-in-law, Noelle Allen and Dr. Matt Kirkland respectively, established PhillyWine LLC and acquired his business, including the assumption of the business's liabilities and obligations. There is some question about the exact scope of this transaction, though, because PhillyWine has not submitted any assignment agreement, transfer documents, or other contemporaneous records. PhillyWine contends that Mr. Ewing assigned the business's assets, including its goodwill and asserted trademark rights. The new owners continued operating as a WSET-approved provider and expanded the business's programming and institutional relationships.

After the transition, the business underwent a period of operational development, apparently including online offerings that were not immediately available for purchase and classes held at temporary locations such as the Sofitel Hotel in Philadelphia. Over time, PhillyWine expanded and formalized its operations. It entered institutional partnerships with Drexel University's Goodwin College of Professional Studies, where courses began in early 2026, as well as with James Madison University and Northampton Community College. PhillyWine also shifted its physical model. Although it had historically operated across rotating venues, it began offering classes at a fixed location at the Fitler Club in Philadelphia, a short distance from the Wine School Of Philadelphia's facility.

PhillyWine promotes its services through its website, email communications, and social media. For years, it used the Instagram handle @_phillywine_. In 2025, it changed that handle to @phillywineschool and updated certain online biographies to refer to its principals as associated with "PhillyWine School." (ECF No. 25 at 7, 10.) More than 5,600

students have participated in its courses over time, and the business has generated several million dollars in revenue, with substantial investment in advertising and promotion.

**2. Wine School**

KSWCO operates a wine education business in Philadelphia historically known as the Wine School of Philadelphia. The business traces back to 2001, when Mr. Wallace began offering introductory wine classes in the region before developing a more formalized educational program. In its early years, the program held classes at temporary venues, but it quickly evolved into a structured institution offering recurring courses, certification tracks, and public-facing events.

Over time, the Wine School established a consistent physical presence. After operating in several locations, it settled in 2015 at 109 South 22nd Street, where it continues to host classes and programming on a regular basis. Its programming includes wine classes, certification tracks, tastings, and events, and, like PhillyWine, it serves consumers interested in wine education at varying levels of experience. The school has developed a base of repeat students and participants drawn from the local community. The Wine School does not offer WSET courses, but it conducts classes frequently, often multiple times per week. It promotes and offers its programming through its website, vinology.com.

As the business developed, it appeared in the marketplace under both its formal name and shorter variations. Media coverage and third party publications referred to it as "the Wine School" and "Philly Wine School" as early as 2005, and that terminology

continued to appear in articles, reviews, and event descriptions over time. (*Id.* at 8-9; ECF No. 25-1 at 19, 91.) Beginning around 2016, the Wine School used "Philly Wine School" more specifically in connection with consumer-oriented classes, and that terminology appeared in promotional materials and media coverage. Mr. Wallace also used related branding, including the Instagram handle @phillywine, to promote those offerings.

### 3. The parties' relationship

For many years, the parties operated in the same geographic market without litigation. During that period, they offered overlapping services but maintained distinct identities shaped by differences in format, location, and presentation. PhillyWine's programming was distributed across multiple venues and later expanded online, while the Wine School's operations were anchored to a single, consistent location. Their offerings also appear to have appealed to somewhat different audiences, with PhillyWine emphasizing credentialed instruction and the Wine school offering programming oriented toward general consumers and enthusiasts. In 2019, counsel associated with WSET contacted Mr. Wallace regarding comparisons on his website between his business and PhillyWine. In response, Mr. Wallace revised his website to include disclaimers distinguishing the two.

The parties' relationship took a turn after PhillyWine LLC acquired Mr. Ewing's business. According to the Wine School, it did not know who had taken over Mr. Ewing's program until late 2024, when the business began using "PhillyWine School" in its outward-facing materials. Around that time, PhillyWine updated its branding and online

presence, including references to "PhillyWine School" on its website, marketing materials, and social media accounts. Web archives indicate that earlier versions of PhillyWine's website did not use that terminology.

As these developments unfolded, the parties' proximity increased both geographically and in how they presented their services to consumers. This overlap coincided with instances of apparent consumer confusion. PhillyWine identifies inquiries from prospective students who referenced "Philly Wine School" when seeking information about its courses, as well as online reviews and public comments that do not clearly distinguish between the two businesses. The Wine School attributes that confusion to PhillyWine's use of overlapping terminology and contend that it has affected their own programming, including the cancellation of at least one course offering.

**4. The federal trademark application and registration**

On November 23, 2024, Mr. Wallace, through his entity KSWCO, applied to register the mark "PHILLY WINE SCHOOL" with the United States Patent and Trademark Office for wine education services. In that application, Mr. Wallace asserted a first-use date of August 15, 2016, and declared that, to his knowledge, no other party had the right to use the mark in a confusingly similar manner. The USPTO initially refused registration on the grounds that the mark was geographically descriptive. In response, Mr. Wallace did not dispute the descriptive nature of the mark. Instead, he sought registration under Section 2(f) of the Lanham Act by asserting that the mark had acquired distinctiveness through use in commerce. To support that position, he submitted additional materials, including

a declaration attesting to substantially exclusive and continuous use of the mark for several years, as well as evidence aimed at showing recognition of the mark in the marketplace.

After reviewing that supplemental submission, the USPTO accepted the claim of acquired distinctiveness and approved the mark for registration. It ultimately issued a registration for "PHILLY WINE SCHOOL" on December 9, 2025. The record also reflects that Mr. Wallace was aware of the existence of PhillyWine before filing the application.

**5. Enforcement efforts and escalation of the dispute**

After obtaining registration, Mr. Wallace undertook efforts to protect the goodwill associated with the "Philly Wine School" mark and his business. He did so in response to PhillyWine's use of similar terminology in its branding and online presence, which the Wine School contends created confusion in the marketplace and traded on its reputation. Against that backdrop, Mr. Wallace sought to enforce the mark through third party platforms that host or promote PhillyWine's business. He submitted complaints to social media and web-service providers asserting that PhillyWine's use of similar terminology infringed the registered mark. Those efforts included communications with Instagram on or around December 18, 2025, which resulted in the suspension of PhillyWine's @phillywineschool account. PhillyWine had used that account to promote courses, communicate with students, and maintain its online presence.

PhillyWine represents that it lost access to that account, including its accumulated followers and content, and has been unable to restore it. The account had functioned as

a primary means of outreach, particularly for announcing upcoming classes and engaging with prospective students. PhillyWine contends that the account will be permanently disabled if Mr. Wallace does not withdraw his complaint before June 16, 2026. After the suspension, PhillyWine created a new Instagram account under the handle @mywineschool to continue promoting its courses and communicating with students. Mr. Wallace offered to restore the original account if PhillyWine agreed to stop using the @phillywineschool handle, but PhillyWine declined. The parties dispute both the purpose and the effect of these enforcement actions.

On or around December 23, 2025, Mr. Wallace also contacted Google regarding PhillyWine's business listing. He submitted an "ownership request" seeking to transfer control of PhillyWine's Google Business account. That listing appeared in search results and on Google Maps and included information about PhillyWine's courses, location, and contact details. The complaint asserted that the use of "Philly Wine School" in connection with that listing infringed KSWCO's registered mark.

On January 5, 2026, Mr. Wallace submitted a similar complaint to Squarespace, the platform hosting PhillyWine's website at phillywine.com. That complaint likewise asserted trademark infringement based on PhillyWine's use of "Philly Wine School" in connection with its services. Although the site has not been removed, PhillyWine contends that the complaint placed its website at risk of disruption and required a response to avoid potential suspension.

### B. Procedural History

PhillyWine initiated this action on February 26, 2026, following KSWCO's registration of the mark and efforts to enforce it. The Complaint asserts claims under the Lanham Act and related theories, challenging both the validity of KSWCO's registration and its use of the mark in commerce. Shortly after filing suit, PhillyWine moved for a preliminary injunction. Through that motion, it seeks to enjoin the Wine School's use of "Philly Wine School," prohibit further enforcement efforts directed at third party platforms, and require the Wine School to withdraw complaints submitted to entities such as Instagram, Squarespace, and Google. The motion also asks me to prevent the Wine School from interfering with PhillyWine's online accounts and business listings during the pendency of this litigation. The preliminary injunction motion is ripe for disposition. I resolve it on the written submissions without an evidentiary hearing or oral argument.[2]

## II. LEGAL STANDARD

A district court has discretion to grant or deny a preliminary injunction. *Reilly v. City of Harrisburg*, 858 F.3d 173, 178-79 (3d Cir. 2017). The primary purpose of preliminary injunctive relief is to maintain the status quo until the court can render a decision on the merits. *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). The status quo refers to "the last, peaceable, noncontested status of the parties." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citations omitted). Because a preliminary injunction

[2] During a status call that I conducted, each party stated that it did not seek an evidentiary hearing on the motion.

is an extraordinary remedy, a moving party must make a clear showing that it is entitled to that relief. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must demonstrate: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms.*, 369 F.3d at 708; *see also Winter*, 555 U.S. at 20. The first two factors are "the most critical," and the moving party bears the burden of making the requisite showing. *Reilly*, 858 F.3d at 176, 179 (citations omitted). If either or both of the fundamental requirements—likelihood of success on the merits and probability of irreparable harm if relief is not granted—are absent, an injunction cannot issue. *See McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.,* 24 F.3d 519, 523 (3d Cir.1994).

When resolving a motion for a preliminary injunction, a district court sits as both the trier of fact and the arbiter of legal disputes. A court must, therefore, make "findings of fact and conclusions of law upon the granting or refusing of a preliminary injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1178 (3d Cir. 1990) (citing Fed. R. Civ. P. 52(a)(2)). This requirement must be met "even when there has been no evidentiary hearing on the motion." *Id.* Nevertheless, at the preliminary injunction stage, "procedures … are less formal and evidence is less complete than in a trial on the merits." *Kos Pharms.*, 369 F.3d at 718. Accordingly, a court "may rely on affidavits and hearsay materials which would not be admissible evidence." *Kos Pharms.*, 369 F.3d at 718 (quoting *Levi Strauss & Co. v.*

*Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). The weight given to such materials will vary depending on the facts and circumstances of the case. *Id.* at 719.

## III. DISCUSSION

### A. Likelihood Of Success On The Merits

A party seeking a preliminary injunction must establish a likelihood of success on the merits. *Winter*, 555 U.S. at 20. In evaluating whether a movant has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." *Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir.1975).

Trademark law protects a mark holder's right to use its mark exclusively when another's use is likely to cause confusion.[3] *See Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005). "A trademark is defined in 15 U.S.C. § 1127 as including 'any word, name, symbol, or device or any combination thereof' used by any person 'to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if

[3] PhillyWine's Complaint includes several additional state law claims. In its motion for a preliminary injunction, however, it does not address those claims or explain how they bear on the preliminary injunction analysis. A party seeking preliminary relief bears the burden of showing, among other things, a likelihood of success on the merits of the claims it asserts. *Ferring Pharm,* 765 F.3d at 210. That requires more than simply pleading those claims in a complaint; it requires developing argument and pointing to evidence that would support them at this stage. Accordingly, I do not evaluate those claims independently or consider them as a basis for granting a preliminary injunction.

that source is unknown.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (quoting 15 U.S.C. § 1127). To prevail on a claim for trademark infringement, a plaintiff must establish that "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (quoting *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000)). The same standard applies to claims for federal trademark infringement, federal unfair competition, and Pennsylvania common law unfair competition. *A & H Sportswear*, 237 F.3d at 210.

PhillyWine asserts rights in three marks—"PhillyWine," "phillywine.com," and "Philly Wine School." The alleged infringement, however, centers on the Wine School's use of "Philly Wine School," which is the relevant mark for purposes of assessing the merits of PhillyWine's claims. For that mark in particular, PhillyWine cannot establish any of these elements. It therefore has not shown a likelihood of success on the merits.

**1. Validity and protectability**

A party can prove a mark's validity and legal protectability whether the mark is federally registered or not. *See United States PTO v. Booking.com B.V.*, 591 U.S. 549, 553 (2020). Common law protects an unregistered mark only to the extent that the mark is inherently distinctive or has acquired distinctiveness through secondary meaning. *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986). Courts assess distinctiveness by placing marks into categories, from strongest to weakest. *MNI Mgmt., Inc. v. Wine King,*

*LLC*, 542 F. Supp.2d 389 (D.N.J. 2008). Arbitrary and fanciful marks bear no logical relationship to the goods or services and are inherently distinctive. *A & H Sportswear, Inc.*, 237 F.3d at 221. Suggestive marks, which require some imagination to connect the mark to the product, are also inherently distinctive. *Id.* at 221-22. At the other end are descriptive marks, which "convey[] an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 221. Descriptive marks are not protectable unless they have acquired secondary meaning. *See Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 769 (1992). A mark has secondary meaning when consumers understand it not only to identify a product or service, but also to identify its source. *See Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 438. "Proof of secondary meaning entails vigorous evidentiary requirements, and the burden of proof rests upon the party asserting rights in the purported mark." *Patient Transfer Sys., Inc. v. Patient Handling Sols., Inc.*, No. CIV. A. 97-CV-1568, 1999 WL 54568, at *6 (E.D. Pa. Jan. 29, 1999) (quoting *Ideal World Marketing, Inc. v. Duracell, Inc.*, 15 F. Supp. 2d 239, 245 (E.D.N.Y. 1998)).

**a. Type of mark**

PhillyWine cannot establish that "Philly Wine School" is inherently distinctive. The phrase describes, in straightforward terms, the service that it offers. "Philly" denotes Philadelphia. "Wine" identifies the subject matter. "School" describes the nature of the service that PhillyWine offers. Put together, the phrase conveys an immediate idea of a

wine school located in Philadelphia. It does not require imagination, thought, or perception to understand what the business does. It says it directly.

That is the hallmark of a descriptive mark. *See A & H Sportswear*, 237 F.3d at 221. Courts routinely find marks descriptive where they combine a geographic term with the service offered. *See Trans Pac. Ins. Co. v. Trans-Pac. Ins. Co.*, 739 F. Supp. 240, 244 (E.D. Pa. 1990); *Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 1362 (Fed. Cir. 2018). This mark fits comfortably in that category. PhillyWine does not argue otherwise. Its arguments instead focus on use and confusion, which bear on secondary meaning rather than inherent distinctiveness. Because "Philly Wine School" is descriptive, PhillyWine must establish that the mark has acquired secondary meaning.

**b. Secondary meaning**

To show secondary meaning, PhillyWine must demonstrate that "the consuming public primarily associates the mark with a particular source." *Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 438. Secondary meaning is generally established through extensive advertising which creates in the minds of consumers an association between different products bearing the same mark; this association suggests that the products originate from a single source. *Scott Paper Co.*, 589 F.2d at 1228. To determine secondary meaning, a court may consider the following (non-exclusive) list of factors: "(1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of

customers; and, (11) actual confusion." *Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 438 (citation omitted). No single factor is dispositive. The question remains whether the mark identifies a single source in the minds of consumers. *Lapp,* 721 F.2d at 462.

PhillyWine's evidence does not establish that association. First, much of the evidence establishes that PhillyWine and its predecessor did not continuously use the name "PhillyWine" in commerce, let alone the name "Philly Wine School." Instead, for much of its existence, it marketed itself under the banner "Neil Ewing Wine Services." The primary use of a phrase related to "PhillyWine" was its domain name "phillywine.com," but that alone is not enough to establish use, and PhillyWine doesn't argue otherwise.

Second, to the extent PhillyWine offers evidence about its use of the term "PhillyWine," that evidence centers on its broader business identity and its use of different designations such as "PhillyWine" and "phillywine.com." That evidence could demonstrate recognition of those terms, though in my view it doesn't reach that level. But in any event, it does not demonstrate that consumers associate the distinct phrase "Philly Wine School" with PhillyWine. Evidence that consumers recognize one name does not, without more, establish that they associate a different phrase with the same provider, and the record does not provide that additional showing. *See id.* at 438.

To the contrary, nothing in the record suggests that PhillyWine's consumers encountered "Philly Wine School" associated that phrase with PhillyWine's services before 2025 or that anyone came to understand the phrase as identifying PhillyWine's business. Its customer declarations underscore the point—they consistently reference familiarity

with "PhillyWine," not the mark at issue. That pattern confirms that any goodwill in the marketplace attaches to a different designation.

The remainder of PhillyWine's evidence does not change that result. Its proof of sales, growth, and market presence reflects the success of its business, but it does not tie that success to the "Philly Wine School" mark. Nor does its evidence of actual confusion carry meaningful weight. The few instances it identifies arise only after more recent use of the phrase, including in 2025, and therefore do not demonstrate longstanding marketplace recognition.

Exclusivity presents a further obstacle. The phrase "Philly Wine School," like "Philly wine," is descriptive of a category of services, and similar terminology appears in use by third parties across the wine community to refer to businesses, programs, and individuals. (See ECF No. 25 at 19–20.) That type of widespread descriptive use undermines any inference that consumers would associate the phrase with a single provider. PhillyWine offers no evidence to the contrary.

My conclusion that "Philly Wine School" does not have secondary meaning might appear in tension with the fact that the Wine School obtained a federal registration for one of the same marks that PhillyWine asserts based on a showing of acquired distinctiveness before the USPTO. But PhillyWine asserts its own rights in the mark and must make its own showing. That inquiry turns on the evidence PhillyWine has produced. Having reviewed that evidence, it is not sufficient to establish that the phrase has acquired secondary meaning as PhillyWine has used it. This conclusion does not call into question

the USPTO's determination; it reflects only that PhillyWine has not met its burden to establish that the marks it asserts are valid and legally protectable.

PhillyWine also argues that the term "school" is descriptive, and its showing that "PhillyWine" is distinctive renders the term "Philly Wine School" a logical descriptive extension of its distinctive mark. But because I have concluded that "PhillyWine" is not distinctive, that argument fails.

### 2. Ownership of the "Philly Wine School" trademark

Even if KSWCO's federal registration remains presumptively valid, PhillyWine can still prevail by showing that it "had prior rights or 'priority' in the mark" such that it can establish ownership of the mark.[4] *Lucent*, 186 F.3d at 315 (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir. 1978). Trademark rights arise from use, not registration, and a senior user may defeat a later registrant by showing priority.[5] *Beasley v. Howard*, 14 F.4th 226, 237 (3d Cir. 2021). Under the Lanham Act, "use in commerce" is defined as "the bona fide use of a mark in the ordinary course of trade, and not made

[4] The Parties spend substantial time debating whether KSWCO's federal registration of "Philly Wine School" is valid, but that dispute doesn't seem to matter. Even if KSWCO's registration is valid, PhillyWine might still have senior rights. However, because I conclude that PhillyWine doesn't have senior rights, I don't have to determine, for purposes of a preliminary injunction, whether PhillyWine is likely to prevail in its challenge to KSWCO's federal registration. To the extent that PhillyWine argues that it should obtain a preliminary injunction just because it might prevail in its challenge to KSWCO's registration, I reject that argument because PhillyWine has not made a showing that KSWCO's common law trademark rights are invalid.

[5] This intuition extends beyond the law. Apropos of this case, Neil Diamond wrote "Red Red Wine" in 1967, but UB40's cover in 1983 made the song globally famous. Most listeners know the UB40 version, but Neil Diamond still owns the song.

merely to reserve a right in a mark." 15 U.S.C.§ 1127. Thus, to prevail, PhillyWine must show that it used the mark in commerce before KWSCO and that its use was sufficiently public to identify its services in the minds of consumers. That inquiry turns on both priority of use and market penetration. *Lucent*, 186 F.3d at 315-17.

Courts assess market penetration by considering (1) volume of sales of the trademarked product; (2) the growth trends, both positive and negative, in the area; (3) the number of people purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area. *See Natural Footwear, Ltd., v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398-99 (3d Cir. 1985). The use must be more than *de minimis*, but it need not reflect overwhelming success. Even modest commercial activity may suffice if it reflects genuine use of the mark followed by continued efforts to develop the market. *See Lucent*, 186 F.3d at 317-18.

**a. Prior use and market penetration of "Philly Wine School"**

PhillyWine's evidence does not establish prior use or market penetration.[6] PhillyWine points to website materials from the early 2000s that reference its programming, but those references are descriptive and embedded in broader text. They do not show that PhillyWine presented "Philly Wine School" to the public as the name of its services. Nor would those isolated references have created meaningful recognition of

[6] For purposes of this analysis, I assume that Neal Ewing transferred the asserted trademark rights to PhillyWine LLC. If this case moves forward, PhillyWine will have to provide proof of that transaction.

the phrase in the marketplace. Trademark rights arise when a term is used consistently and prominently so that consumers associate it with a source. *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983). The materials PhillyWine identifies do not reflect that kind of use.

The broader record reinforces that conclusion. For much of the relevant period, the business promoted itself as "Neal Ewing Wine Services." That was its outward-facing identity. A phrase cannot develop market significance if it is not the name under which the business holds itself out to consumers. If "Philly Wine School" had served that role, the record would reflect consistent and visible use of that phrase across advertising, course offerings, and public-facing materials. It does not. Instead, the record shows more direct use of the phrase only in recent years, including changes to social media in 2025. That timing undermines any claim of longstanding recognition.

PhillyWine's evidence of business growth points me in the same direction. PhillyWine emphasizes decades of operation, increasing enrollment, and millions of dollars in revenue. But it presents those metrics at the enterprise level. They do not show that any of that commercial activity occurred under the "Philly Wine School" name. PhillyWine does not isolate sales made using that mark, provide any breakdown of revenue tied to it, or show that customers purchased services because they encountered that phrase in the market. Growth can reinforce market recognition, but only if it reflects increasing use of the mark at issue. In this case, the record does not connect the business's

growth to "Philly Wine School," nor does it suggest that any increase in revenue corresponded with greater public recognition of that phrase.

The same disconnect appears in PhillyWine's evidence concerning its customers and advertising. It points to the breadth of its student base, its national reach, and its role as a WSET provider. But it does not show that those customers understood "Philly Wine School" to refer to its services. The declarations confirm as much—students and industry participants refer to "PhillyWine," not "Philly Wine School," when describing their experiences. That is telling. It indicates that whatever goodwill exists in the marketplace attaches to the "PhillyWine" name rather than the phrase now at issue. Nor does PhillyWine show that its advertising promoted "Philly Wine School" as its brand or exposed consumers to that phrase in a way that would create recognition. Promotion of one name does not establish recognition of another.

PhillyWine's own admissions underscore these points. It acknowledges that it "did not regularly use 'Philly Wine School.'" (ECF No. 30 at 5.) That concession is difficult to reconcile with its claim of longstanding market recognition. Recognition in the marketplace develops through repeated and consistent exposure to a name. Sporadic or recent use cannot produce that result. At most, the record reflects isolated references followed by more recent, deliberate use of the phrase. That is not enough to establish prior use and market recognition. Thus, PhillinWine has not established ownership of the mark.

### b. Family of marks theory

PhillyWine also suggests a different path to priority. It contends that because it used "phillywine.com" and "PhillyWine" before the Wine School, and because "Philly Wine School" is simply a related formulation that adds a generic term, those uses establish priority in "Philly Wine School" that predates the Wine School's use of the mark. In effect, it invokes a family of marks theory.

"A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner." *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991). Trademark law recognizes a family of marks theory in limited circumstances where there is a "recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods." *See J & J Snack Foods Corp.*, 932 F.2d at 1462; *A & H Sportswear, Inc.*, 237 F.3d at 222. In other words, "[s]imply using a series of similar marks does not of itself establish the existence of a family." *Primepoint, L.L.C. v. PrimePay, Inc.*, 545 F. Supp. 2d 426 (D.N.J. 2008) (citations omitted).

PhillyWine has not established the elements required to invoke that doctrine. It does not show that it used a consistent series of marks sharing a common characteristic in a way that would create a recognizable pattern in the marketplace. Nor does it show that consumers perceive any shared element—such as "PhillyWine" or "Philly Wine"—as

identifying a single source across multiple marks. The evidence instead indicates that recognition attaches to "PhillyWine" and "phillywine.com" as individual designations, not to a broader family of marks. PhillyWine also does not show that consumers view "Philly Wine School" as part of a unified branding scheme or associate that phrase with the same source based on any common element. Without evidence of both a pattern of use and consumer recognition of a shared characteristic, the family of marks theory does not apply. PhillyWine's prior use of "PhillyWine" therefore does not establish priority in the distinct mark "Philly Wine School."

### 3. Likelihood of Confusion

To prevail on its infringement claims, PhillyWine must also show that the Wine School's use of "Philly Wine School" is likely to cause confusion. *See A&H Sportswear*, 237 F.3d at 210-11. Likelihood of confusion exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Dranoff–Perlstein Assoc. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992).

As the Third Circuit recognized in *Lapp*, although secondary meaning and likelihood of confusion are formally distinct concepts, the two inquiries may be difficult to separate in practice because the evidence supporting each often overlaps. 721 F.2d at 462, 465. Courts in this Circuit evaluate likelihood of confusion by applying the ten *Lapp* factors, which include: "(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods

and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market*."* *Lapp*, 721 F.2d at 463. No single factor controls the analysis, and the factors do not carry equal weight in every case. The inquiry is qualitative, not quantitative, and courts must evaluate the factors in light of the particular facts presented. *See id.* at 463; *A & H Sportswear, Inc.*, 237 F.3d at 214-15.

**a. Degree of similarity**

Marks "are confusingly similar if ordinary consumers would likely conclude that [two products] share a common source, affiliation, connection or sponsorship." *Fisons*, 30 F.3d at 477. Courts should not conduct a "side-by-side comparison," but instead should analyze "whether the labels create the same overall impression when viewed separately" by examining sight, sound, and meaning of the marks*. Sabinsa Corp. v. Creative*

*Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010). The Third Circuit has recognized that similarity may be the most important of the *Lapp* factors. *Fisons*, 30 F.3d at 476.

PhillyWine asserts rights in "PhillyWine," "Phillywine.com," and "Philly Wine School," while the Wine School uses "Philly Wine School." To the extent PhillyWine relies on that same phrase, the marks are identical in wording, which weighs in favor of similarity. But the phrase itself is composed of ordinary terms that describe the location and subject matter of the services. That feature limits how much weight identity alone carries and requires closer attention to how the phrase functions in the marketplace.

The comparison between "PhillyWine," "Phillywine.com," and "Philly Wine School" points in a different direction. The marks share the terms "Philly" and "Wine," which are the most recognizable components of each and would likely draw a consumer's attention. At the same time, the marks differ in structure, sound, and meaning. "PhillyWine" appears as a single, continuous term that functions as a brand name. "Philly Wine School," by contrast, appears as a multi-word phrase that describes a type of business. The inclusion of the word "School" signals a particular category of services and gives the phrase a descriptive character that differs from the more compact presentation of "PhillyWine."

The shared terms create some overlap in impression, while the structural and descriptive differences distinguish the marks in how consumers encounter them. Considering the marks as a whole, this factor does not favor either party.

**b. Strength of the mark**

The second *Lapp* factor considers the strength of the asserted mark. Stronger marks are more likely to cause confusion. *See Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 203 (3d Cir. 1995). The strength of a mark is determined by "the distinctiveness or conceptual strength of the mark" and "the commercial strength or marketplace recognition of the mark." *Id.* at 221. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of 'marketplace recognition.'" *Id.*

Considering the asserted marks collectively, this factor does not favor PhillyWine. As to conceptual strength, "Philly Wine School" is descriptive. The phrase conveys the location and subject matter of the services and does not require imagination or inference. Marks of that kind are comparatively weak. The same is largely true of "phillywine.com," which combines a geographic term with the subject matter of the services and adds only a domain suffix. Although "PhillyWine," presented as a single term, is somewhat more distinctive, it still incorporates common terms that appear in the marketplace in connection with wine-related services. The presence of similar terminology in use by others bears on how distinctive these marks are in context and weighs against a finding of strong conceptual distinctiveness.

The marks are also weak in terms of commercial strength. That inquiry turns on whether consumers recognize the marks as identifying a particular provider. *See A & H Sportswear*, 237 F.3d at 224. PhillyWine relies on evidence of its overall success, including

its years of operation, revenue, customer base, and marketing efforts. That evidence shows that PhillyWine operates a successful business, but it does not establish that consumers associate the asserted marks—particularly "Philly Wine School"—with PhillyWine. As I've explained, the record reflects that at most, some recognition in the marketplace attaches to "PhillyWine," not to "Philly Wine School," and PhillyWine has not shown that the marks function together as a cohesive branding scheme. Because the asserted marks are conceptually weak and lack demonstrated marketplace recognition as used by PhillyWine, this factor weighs against a finding of likely confusion.

**c. Time without actual confusion and evidence of actual confusion**

*Lapp* factors (4) and (6) look at evidence of actual confusion. "[W]hile evidence of actual confusion would strengthen plaintiff's case, it is not essential." *Fisons*, 30 F.3d at 476. At the same time, the absence of confusion during a period of concurrent use permits an inference that consumers are unlikely to be confused. *See Kos Pharms.*, 369 F.3d at 717-20.

PhillyWine identifies only a small number of alleged instances of confusion, including a December 2025 email from a student who initially believed a program that KSWCO operated was affiliated with PhillyWine. Even crediting that example, the evidence remains limited. It consists of isolated, anecdotal confusion and does not show a pattern of sustained or widespread misunderstanding in the marketplace. The circumstances of that example further reduce its probative value. The inquiry reflects, at most, an initial

assumption, and nothing in the record shows that the individual enrolled in the wrong program, paid the wrong provider, or remained confused.

The timing of the alleged confusion also limits its significance. The examples arise in late 2025, when PhillyWine began using “Philly Wine School” more directly in its outward-facing branding. That timing makes it difficult to attribute any confusion solely to the Wine School’s use of the phrase and weakens any inference that the phrase previously identified PhillyWine in the marketplace.

More importantly, the record contains no evidence of confusion during earlier periods of coexistence. PhillyWine operated for years under the “PhillyWine” name, while the Wine School used “Philly Wine School,” or similar phrasing, in the marketplace. Yet PhillyWine does not identify any instances of confusion from that earlier period or point to contemporaneous complaints or inquiries. On this record, the evidence of actual confusion remains minimal, and the absence of confusion over a period of concurrent use further diminishes its significance. This factor does not favor PhillyWine.

**d. Intent**

The fifth *Lapp* factor examines the Wine School’s intent. A defendant’s “intentional, willful and admitted adoption of a mark closely similar to the existing marks” may provide strong evidence of a likelihood of confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 286 (3d Cir. 2001). Courts also consider the adequacy and care with which a defendant investigates and evaluates a proposed mark, as well as its

knowledge of similar marks or allegations of potential confusion. *See Kos Pharms.*, 369 F.3d at 721.

The record reflects that the Wine School was aware of PhillyWine's business. Both parties operated in the same geographic market and offered wine education services in Philadelphia, which supports an inference of awareness. But the relevant question is whether KSWCO adopted or used "Philly Wine School" to capitalize on the goodwill and reputation associated with that mark. *Homevestors of Am., Inc. v. Warner Bros. Discovery*, No. CV 22-1583-RGA, 2025 WL 2301911, at *8 (D. Del. Aug. 8, 2025). The record does not support that inference. Evidence in the record shows that third parties have referred to KSWCO's business as "Philly Wine School," or similar variations, in media coverage and third party publications dating back to the mid-2000s, while PhillyWine operated under the "PhillyWine" name and domain. Despite that overlap, PhillyWine identifies no evidence of conflict, confusion, or enforcement efforts during those years, which undercuts the claim that KSWCO adopted the phrase to trade on an established mark belonging to PhillyWine.

PhillyWine instead points to KSWCO's more recent conduct of filing various third party complaints following federal registration. But KSWCO's decision to enforce its registered mark through established channels does not, by itself, demonstrate bad faith. The timing of those actions corresponds with KSWCO's own more recent use of "Philly Wine School" in its outward-facing branding, including changes to its social media presence in 2024 and 2025. Additionally, Mr. Wallace offered to restore PhillyWine's



**App. 0032**

Instagram account if it agreed to stop using the @phillywineschool handle, which reflects an effort to assert and resolve competing claims rather than to create confusion. On this record, the evidence shows a dispute over competing uses of a descriptive phrase, not an attempt to mislead consumers or trade on another's reputation. This factor does not favor PhillyWine.

**e. Marketing channels, advertising media, and target customers**

The seventh *Lapp* factor examines whether the parties market their services through the same channels of trade and advertise through similar media. *See A & H Sportswear*, 237 F.3d at 215. Courts consider the media the parties use to promote their services, including the ways in which they reach consumers through advertising and sales efforts. *See Checkpoint*, 269 F.3d at 288-89; *Kos Pharms.*, 369 F.3d at 722. The eighth *Lapp* factor considers whether the parties seek to attract the same class of consumers. *See Checkpoint*, 269 F.3d at 288-89. Where the parties target overlapping audiences, the likelihood of confusion increases because consumers are more likely to encounter the marks in similar purchasing contexts. *Id.*

In thise case, the parties' marketing channels and target customers overlap in various ways. Both offer wine education services in the Philadelphia area and operate in the same geographic market, with locations in close physical proximity to one another. That proximity increases the likelihood that consumers will encounter both parties when searching for or considering wine education services. Each promotes its offerings through

similar means, including websites, social media platforms such as Instagram, online listings, and email outreach. Both also appear in search results and on third party platforms that aggregate local businesses and educational offerings. Consumers seeking wine education are therefore likely to encounter both parties through the same general channels, particularly through online searches and social media, where the marks may appear in proximity to one another.

At the same time, the parties present their offerings differently. PhillyWine emphasizes structured certification programming, including WSET courses, while KSWCO focuses more on consumer-oriented classes and events and have maintained a more consistent physical location. These differences reflect variations in emphasis, not distinct markets. Consumers interested in wine education may reasonably consider both types of offerings depending on their level of interest or experience.

Taken together, the overlap in marketing channels, geographic market, and target customers outweighs the differences in presentation. These factors weigh slightly in PhillyWine's favor, although the differences in emphasis and branding limit the strength of that conclusion.

**f. Price and the relation of goods in the minds of consumers**

These *Lapp* factors consider the conditions under which consumers encounter the parties' services, whether those services are sufficiently related that consumers would

expect a common source, and whether other circumstances suggest likely association. *See Checkpoint*, 269 F.3d at 284, 286, 290; *Kos Pharms.*, 369 F.3d at 722-23.

Consumers of wine education services exercise varying levels of care. Certification programs require a financial and time commitment, which encourages comparison of providers based on curriculum, scheduling, and level of instruction. That context reduces the likelihood of confusion. At the same time, both parties offer more casual, lower-cost classes that consumers may select with less deliberation. These considerations offset one another and do not point decisively in either direction.

The parties' services overlap to a degree, as both offer wine education in the same geographic market. Consumers could view certain offerings as substitutes. That overlap, however, largely mirrors considerations addressed elsewhere, including the similarity of services and shared audience, and does not independently alter the analysis here. These factors do not favor either party and are neutral.

**g. Weighing the factors**

Considering the *Lapp* factors as a whole, PhillyWine has not shown a likelihood of confusion. The factors that carry the greatest weight point away from confusion. The asserted mark is descriptive and lacks demonstrated marketplace recognition, which limits the scope of protection afforded to it. The evidence of actual confusion is minimal, recent, and tied to PhillyWine's own more recent use of the phrase, and the parties operated for years without any identified instances of confusion. That history undermines any inference that consumers associate "Philly Wine School" with PhillyWine. The evidence also does

not support a finding that the Wine School adopted or used the phrase to trade on PhillyWine's goodwill. These considerations collectively weigh against a finding that consumers are likely to be confused.

The remaining factors do not alter that conclusion. Although the marks share the terms "Philly" and "Wine," that overlap reflects descriptive language used by multiple providers, and the marks differ in structure and meaning when considered as a whole. The parties use similar marketing channels, target similar consumers, and operate in close geographic proximity, which increases the likelihood that consumers will encounter both offerings. Even so, those considerations carry less weight here given the nature of the phrase at issue and the absence of suggestive evidence of confusion. The conditions under which consumers purchase these services cut in different directions and do not favor either side, and the relationship between the parties' offerings largely overlaps with considerations already addressed. In this context, the overlap in channels, audience, and location does not outweigh the factors pointing away from confusion. The balance of the *Lapp* factors therefore does not support a finding that the Wine School's use of "Philly Wine School" is likely to cause confusion, and PhillyWine has not established a likelihood of success on the merits of its infringement claim.

**B. Irreparable Harm**

To obtain a preliminary injunction, a party must make a clear showing of "immediate irreparable injury" or a "presently existing actual threat." *Acierno*, 40 F.3d at 655. Irreparable harm refers to injury that cannot be repaired, retrieved, or adequately

compensated after a final judgment, and the plaintiff must show that an injunction is necessary to prevent that harm. *Id.* at 652-53. A speculative risk or the mere possibility of future injury does not suffice. *Id.* at 655. Nor does economic loss, standing alone, qualify as irreparable harm because monetary damages can address that type of injury. *Id.* at 652.

A "party seeking a preliminary injunction in a Lanham Act case is not entitled to a presumption of irreparable harm but rather is required to demonstrate that she is likely to suffer irreparable harm if an injunction is not granted." *Ferring Pharm., Inc. v. Watson Pharm., Inc.,* 765 F.3d 205, 217 (3d Cir. 2014). In the trademark context, courts recognize that certain types of harm, such as loss of control over reputation, damage to goodwill, and the risk of consumer confusion, may be difficult to quantify and therefore can constitute irreparable injury. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195-96 (3d Cir. 1990); *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998). Even so, a plaintiff is not entitled to rely on those principles in the abstract. It must show that irreparable harm is likely in the absence of an injunction. *See Ferring Pharms., Inc.*, 765 F.3d at 217.

PhillyWine has shown a likelihood of irreparable harm. The harm it identifies does not rest solely on alleged consumer confusion. Instead, it arises from the disruption of its ability to control how it presents itself to customers and to communicate with them through the channels on which its business depends. Most notably, the suspension of its @phillywineschool Instagram account resulted in the loss of an established platform through which it advertised courses, communicated with students, and maintained

ongoing relationships with its customer base. That loss includes not only past content but also access to followers and prospective students accumulated over time. Those are not losses that can be readily quantified or restored through damages after trial. They go directly to PhillyWine's ability to maintain its presence in the market and to control how its brand is perceived.

The same is true, though to a lesser extent, of the challenges directed at PhillyWine's website and online business listings. Even if those efforts did not result in permanent removal, they introduced instability into the digital infrastructure on which the business relies. Modern service-based businesses depend on consistent online visibility, and the ability to control one's website and public-facing listings is central to maintaining customer relationships and reputation. Interference with those channels, particularly where they occur in connection with assertions of trademark infringement, carries a risk of reputational harm that is difficult to measure after the fact. It can affect how consumers encounter the business, whether they are able to locate it, and whether they perceive it as legitimate or subject to dispute.

The Wine School responds that some of the alleged harm did not materialize and that any remaining harm is either speculative or self-inflicted. But the record reflects that at least one significant disruption has already occurred, and that others were sufficiently concrete to require response. That is enough at this stage. Irreparable harm does not require complete business shutdown or permanent loss of all channels of communication. It requires a showing of a significant risk of harm that cannot be adequately remedied

later. The loss of a primary social media account and the threatened disruption of core online business tools satisfy that standard.

### C. Balance of Equities

In determining whether a preliminary injunction should issue, a judge must balance the potential hardships that either side will endure as a result of the injunction. *Opticians Ass'n of Am.,* 920 F.2d at 197. The balance favors KSWCO. The relief PhillyWine seeks would require KSWCO to stop using "Philly Wine School" and to unwind enforcement efforts taken in reliance on a federal trademark registration that remains valid and has not been invalidated. The USPTO's issuance of that registration carries legal consequences, including a presumption of validity and an exclusive right to use the mark in commerce for the listed services. 15 U.S.C. § 1115(a); *Lucent*, 186 F.3d at 315. Enjoining KSWCO from using its registered mark at this stage would therefore deprive it of rights the law recognizes while the merits remain unresolved. It would also disrupt how KSWCO identifies and markets its business, which has operated under that name for years.

PhillyWine, by contrast, continues to operate its business through its website and alternative channels, even if its preferred social media presence has been disrupted. The harms it identifies are not insignificant, but they do not match the scope of the relief it seeks or the burden that relief would impose on the Wine School. Weighing those competing interests, the equities do not favor issuing an injunction.

### D. Public Interest

The public interest concern in trademark infringement cases is "the interest in the prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Kos Pharms.*, 369 F.3d at 730. This factor requires me to consider the consuming public's interest in not being deceived or confused by the use of an infringing mark. *Opticians Ass'n*, 920 F.2d at 197. Because PhillyWine has not shown a likelihood of confusion or established protectable rights in "Philly Wine School," issuing a preliminary injunction would not serve the public interest.

## IV. CONCLUSION

PhillyWine has not carried its burden to show that it is entitled to preliminary injunctive relief. It has not demonstrated a likelihood of success on the merits of its claims, which is a threshold requirement, and the balance of the remaining factors does not alter that conclusion. Although PhillyWine has shown a risk of irreparable harm, that showing cannot overcome its failure to satisfy the gateway requirement. I will therefore deny PhillyWine's motion for a preliminary injunction. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

May 26, 2026